# MARION WILLOUGHBY *v.* CITY OF NEW HAVEN
## (SC 16192)

McDonald, C. J., and Borden, Katz, Sullivan and Vertefeuille, Js.

(*One justice dissenting*)

Argued March 14—officially released September 5, 2000

*Thomas W. Ude, Jr.*, deputy corporation counsel, for the appellant (defendant).

*Jon Berk*, for the appellee (plaintiff).

*Opinion*

BORDEN, J. The dispositive issue in this appeal, on certification from the United States District Court for the District of Connecticut, is whether a municipality that is a self-insurer pursuant to General Statutes §§ 14-129[1] and 38a-371 (c)[2] is required to provide uninsured

---

[1] General Statutes § 14-129 provides: "Self-insurance. (a) Any person in whose name more than twenty-five motor vehicles are registered may qualify as a self-insurer by obtaining a certificate of self-insurance issued by the commissioner as provided in subsection (b) of this section.

"(b) The commissioner may, in his discretion, upon the application of such person, issue a certificate of self-insurance when he is satisfied that such person is possessed and will continue to be possessed of ability to pay judgments obtained against such person.

"(c) Upon not less than five days' notice and a hearing pursuant to such notice, the commissioner may, upon reasonable grounds, cancel a certificate of self-insurance. Failure to pay any judgment within thirty days after such judgment has become final shall constitute a reasonable ground for the cancellation of a certificate of self-insurance."

[2] General Statutes § 38a-371 provides: "Mandatory security requirements. (a) (1) The owner of a private passenger motor vehicle required to be registered in this state shall provide and continuously maintain throughout the registration period security in accordance with sections 38a-334 to 38a-343, inclusive. (2) The owner of a private passenger motor vehicle not required to be registered in this state shall maintain security in accordance with this section, in effect continuously throughout the period of its operation, maintenance or use as a motor vehicle within this state with respect to accidents occurring in this state.

"(b) The security required by this section, may be provided by a policy of insurance complying with this section issued by or on behalf of an insurer licensed to transact business in this state or, if the vehicle is registered in another state, by a policy of insurance issued by or on behalf of an insurer licensed to transact business in either this state or the state in which the vehicle is registered.

"(c) Subject to approval of the Insurance Commissioner the security required by this section, may be provided by self-insurance by filing with the commissioner in satisfactory form: (1) A continuing undertaking by the

and underinsured motorist coverage for a city fire department emergency vehicle while it is operated on public highways. We answer this question in the negative.

The plaintiff, Marion Willoughby, brought this action against the defendant, the city of New Haven, in the United States District Court for the District of Connecticut, in order to recover underinsured motorist benefits.

owner or other appropriate person to perform all obligations imposed by this section; (2) evidence that appropriate provision exists for the prompt and efficient administration of all claims, benefits, and obligations provided by this section; and (3) evidence that reliable financial arrangements, deposits or commitments exist providing assurance for payment of all obligations imposed by this section substantially equivalent to those afforded by a policy of insurance that would comply with this section. A person who provides security under this subsection is a self-insurer. A municipality may provide the security required under this section by filing with the commissioner a notice that it is a self-insurer.

"(d) The owner of any private passenger motor vehicle required to be registered in this state who operates it or permits it to be operated in this state is guilty of a class C misdemeanor if he fails to provide the security required by this section.

"(e) An owner of a private passenger motor vehicle with respect to which security is required who fails to have such security in effect at the time of an accident shall have all of the rights and obligations of an insurer under sections 38a-363 to 38a-388, inclusive, and shall remain subject to all the obligations of the Financial Responsibility Law, sections 14-112 to 14-133, inclusive.

"(f) Upon receipt of a signed written request for suspension from the owner of a registered motor vehicle stating that such vehicle will not be operated upon any highway during a period of not less than thirty consecutive days, the insurer of such vehicle shall suspend, to the extent requested by the owner, insurance coverage afforded under the policy providing the security required by sections 38a-363 to 38a-388, inclusive, for such vehicle until notified by the owner that the coverage should be reinstated. During the period of suspension only, the provisions of subsections (a) to (e), inclusive, of this section shall not apply with respect to such vehicle, provided, if such vehicle is operated upon any highway by or with the permission of the owner during the period of suspension, the provisions of said subsections (a) to (e), inclusive, of this section, shall thereupon become applicable. As used in this subsection, 'highway' shall be defined as in section 14-1. This subsection shall not apply to a motor vehicle for which proof of financial responsibility is required under the provisions of sections 14-112 to 14-133, inclusive."

*Willoughby* v. *New Haven*, United States District Court, Docket No. 3:97CV00668 (D. Conn. July 29, 1999). The District Court certified four issues for this court to determine.[3] Pursuant to the applicable certification procedures; Public Acts 1999, No. 99-107;[4] we agreed to decide those issues. We conclude that a municipality that is a self-insurer, pursuant to §§ 14-129 and 38a-371 (c), is not required to provide underinsured motorist benefits for the emergency vehicle at issue.

The District Court's certification order included the following stipulated facts. At the time of the incident underlying this case, the plaintiff was a firefighter employed by the defendant's fire department. On November 23, 1994, responding to an injured person call, the plaintiff was driving a fire emergency vehicle

---

[3] Specifically, the District Court asked this court to answer the following questions: (1) "Is a municipality which is a self-insurer pursuant to [General Statutes] § 14-129 and/or § 38a-371 (c) required to provide uninsured and/or underinsured benefits for a New Haven Fire Department Emergency Unit while operated on public highways?"; (2) "If uninsured/underinsured motorist protection was provided by the City for the fire emergency unit under the City's self-insurance, was that protection unlimited, or was it limited to $20,000 per person and $40,000 per accident?"; (3) "Does [General Statutes] § 52-557n (b) (6) bar a person from making an uninsured or underinsured motorist claim against the City of New Haven, or another political subdivision of the State of Connecticut, when that person's damages were caused by an uninsured or underinsured motorist who was not an employee, officer or agent of the City?"; and (4) "If underinsured motorist benefits are due, is the City entitled to any reduction or setoff permitted by the Insurance Regulations when, as of the date of the collision, the City had not filed any written policy stating that the City had the right to do so?" In view of our disposition of the first issue, we need not reach the other issues.

[4] Public Acts 1999, No. 99-107, entitled "Uniform Certification of Questions of Law Act," provides in relevant part: "The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state. . . ."

Public Act 99-107, § 14, which was effective June 3, 1999, repealed our state's previous certification procedure, which was codified at General Statutes § 51-199a. See also Practice Book § 82-1 concerning certified questions from federal courts.

(vehicle),[5] specifically, a Ford Yankee coach F-350, equipped with a Ford Ambulance Preparation Package. The vehicle, which was owned by the defendant through its department of fire protection services, was an "[a]uthorized emergency vehicle" pursuant to General Statutes § 14-1 (a) (4),[6] and was registered with the department of motor vehicles as a municipally owned motor vehicle with registration number 125-NH. The vehicle was a truck-type vehicle with a maximum payload of more than 4000 pounds and less than 6000 pounds, and was used by firefighters employed by the defendant primarily to transport medical emergency equipment and technicians to emergency calls.[7]

The plaintiff was driving the vehicle on a public highway when a collision occurred between it and a motor vehicle owned and operated by Anthony Palluzzi, who was not an employee, officer or agent of the defendant. As a result of the collision, which was caused by the negligence of Palluzzi in failing to yield the right-of-way to the vehicle as required by law, the plaintiff sustained serious and permanent injuries.

The plaintiff exhausted the $100,000 liability coverage possessed by Palluzzi, and recovered approximately $270,000 from the defendant pursuant to its workers' compensation plan, for which it is a self-insurer. Those payments have not fully compensated the plaintiff for his injuries.

---

[5] A coemployee of the plaintiff was seated in the passenger seat of the vehicle.

[6] General Statutes § 14-1 (a) (4) provides: " 'Authorized emergency vehicle' means (A) a fire department vehicle, (B) a police vehicle or (C) a public service company or municipal department ambulance or emergency vehicle designated or authorized for use as an authorized emergency vehicle by the commissioner . . . ."

[7] It is undisputed that the vehicle was used to transport emergency equipment and personnel to emergency calls. It was not used to transport victims of the emergency from the scene for medical treatment.

The following stipulated facts relate to the defendant's status as a self-insurer on and prior to November 23, 1994, the date of the incident. The defendant, a political subdivision of the state of Connecticut, was a self-insured municipality in accordance with the meaning of §§ 14-129 and 38a-371 for automobile and motor vehicle liability protection. The defendant owned more than twenty-five motor vehicles, and all of the motor vehicles, including the vehicle at issue in the present case, were protected by the defendant's self-insurance plan.

The defendant had established a specific fund for its self-insurance plan to pay for claims against it arising out of its compensation and public liability. The self-insurance plan had not been reduced to a written document outlining the limitations of the defendant's exposure for its motor vehicles. The defendant had not filed any written document that outlined the limitations of its liability exposure or uninsured and underinsured motorist exposure for its vehicles. The defendant did not request that its uninsured and underinsured motorist liability limits be less than its liability limits for its motor vehicles. At all times relevant to the circumstances of the present case, the defendant owned "[a]uthorized emergency vehicle[s]" as defined by § 14-1. In a letter dated August 9, 1985, the defendant notified the insurance commissioner that it was self-insured for its "auto fleet." In a letter dated February 23, 1990, in response to an inquiry from the insurance commissioner, the defendant reaffirmed its self-insurance plan for "auto liability." On November 23, 1994, the defendant did not possess any commercial insurance policies that would protect it or its employees against losses incurred as a result of either the negligent operation of a motor vehicle or other types of liability. The vehicle possessed a document of self-insurance in the vehicle.

The questions certified to this court present questions of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 755–56, 601 A.2d 1005 (1992)." (Internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 258–59, 736 A.2d 104 (1999).

I

The dispositive certified question raises the issue of whether a municipality that is a self-insurer, pursuant to §§ 14-129 and 38a-371 (c), is required to provide uninsured and underinsured motorist coverage for a New Haven fire department emergency vehicle. The plaintiff claims that such coverage is required because the vehicle at issue is a "[p]rivate passenger motor vehicle" within the definition of General Statutes § 38a-363 (e) (6).[8] The plaintiff also claims that, even if the vehicle

---

[8] General Statutes § 38a-363 (e) provides: " 'Private passenger motor vehicle' means a: (1) Private passenger type automobile; (2) station-wagon-type automobile; (3) camper-type motor vehicle; (4) high-mileage-type motor vehicle, as defined in section 14-1; (5) truck-type motor vehicle with a load capacity of fifteen hundred pounds or less, registered as a passenger motor vehicle, as defined in said section, or as a passenger and commercial motor vehicle, as defined in said section, or used for farming purposes; or (6) a vehicle with a commercial registration, as defined in subdivision (12) of said section. It does not include a motorcycle or motor vehicle used as a public or livery conveyance."

is not a private passenger motor vehicle, the self-insurance statutes require such coverage. The defendant argues, on the contrary, that the vehicle is not a private passenger motor vehicle and, therefore, does not fall within that class of motor vehicles required to provide underinsured motorist coverage as such. The defendant further argues that the self-insurance statutes do not require such coverage. We agree with the defendant.

Although this question requires our analysis of several statutory and regulatory provisions, our starting point is our underinsured motorist coverage statute, General Statutes § 38a-336.[9] Section 38a-336 (a) (1) pro-

---

[9] General Statutes § 38a-336 provides: "Uninsured and underinsured motorist coverage. (a) (1) Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom. Each insurer licensed to write automobile liability insurance in this state shall provide uninsured and underinsured motorists coverage with limits requested by any named insured upon payment of the appropriate premium, provided each such insurer shall offer such coverage with limits that are twice the limits of the bodily injury coverage of the policy issued to the named insured. The insured's selection of uninsured and underinsured motorist coverage shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by any named insured. No insurer shall be required to provide uninsured and underinsured motorist coverage to (A) a named insured or relatives residing in his household when occupying, or struck as a pedestrian by, an uninsured or underinsured motor vehicle or a motorcycle that is owned by the named insured, or (B) any insured occupying an uninsured or underinsured motor vehicle or motorcycle that is owned by such insured.

"(2) Notwithstanding any provision of this section to the contrary, each automobile liability insurance policy issued or renewed on and after January 1, 1994, shall provide uninsured and underinsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless any named insured requests in writing a lesser amount, but not less than the limits specified

vides in relevant part: "Each automobile liability insur-

in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by any named insured. No such written request for a lesser amount shall be effective unless any named insured has signed an informed consent form which shall contain: (A) An explanation of uninsured and underinsured motorist insurance approved by the commissioner; (B) a list of uninsured and underinsured motorist coverage options available from the insurer; and (C) the premium cost for each of the coverage options available from the insurer. Such informed consent form shall contain a heading in twelve-point type and shall state: 'WHEN YOU SIGN THIS FORM, YOU ARE CHOOSING A REDUCED PREMIUM, BUT YOU ARE ALSO CHOOSING NOT TO PURCHASE CERTAIN VALUABLE COVERAGE WHICH PROTECTS YOU AND YOUR FAMILY. IF YOU ARE UNCERTAIN ABOUT HOW THIS DECISION WILL AFFECT YOU, YOU SHOULD GET ADVICE FROM YOUR INSURANCE AGENT OR ANOTHER QUALIFIED ADVISER.'

"(b) An insurance company shall be obligated to make payment to its insured up to the limits of the policy's uninsured and underinsured motorist coverage after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements, but in no event shall the total amount of recovery from all policies, including any amount recovered under the insured's uninsured and underinsured motorist coverage, exceed the limits of the insured's uninsured and underinsured motorist coverage. The limitation on the total amount of recovery from all policies shall not apply to underinsured motorist conversion coverage purchased pursuant to section 38a-336a.

"(c) Each automobile liability insurance policy issued on or after October 1, 1971, which contains a provision for binding arbitration shall include a provision for final determination of insurance coverage in such arbitration proceeding. With respect to any claim submitted to arbitration on or after October 1, 1983, the arbitration proceeding shall be conducted by a single arbitrator if the amount in demand is forty thousand dollars or less or by a panel of three arbitrators if the amount in demand is more than forty thousand dollars.

"(d) Regardless of the number of policies issued, vehicles or premiums shown on a policy, premiums paid, persons covered, vehicles involved in an accident, or claims made, in no event shall the limit of liability for uninsured and underinsured motorist coverage applicable to two or more motor vehicles covered under the same or separate policies be added together to determine the limit of liability for such coverage available to an injured person or persons for any one accident. If a person insured for uninsured and underinsured motorist coverage is an occupant of a nonowned vehicle covered by a policy also providing uninsured and underinsured

## ance policy shall provide insurance, herein called

motorist coverage, the coverage of the occupied vehicle shall be primary and any coverage for which such person is a named insured shall be secondary. All other applicable policies shall be excess. The total amount of uninsured and underinsured motorist coverage recoverable is limited to the highest amount recoverable under the primary policy, the secondary policy or any one of the excess policies. The amount paid under the excess policies shall be apportioned in accordance with the proportion that the limits of each excess policy bear to the total limits of the excess policies. If any person insured for uninsured and underinsured motorist coverage is an occupant of an owned vehicle, the uninsured and underinsured motorist coverage afforded by the policy covering the vehicle occupied at the time of the accident shall be the only uninsured and underinsured motorist coverage available.

"(e) For the purposes of this section, an 'underinsured motor vehicle' means a motor vehicle with respect to which the sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the accident is less than the applicable limits of liability under the uninsured motorist portion of the policy against which claim is made under subsection (b) of this section.

"(f) Notwithstanding subsection (a) of section 31-284, an employee of a named insured injured while occupying a covered motor vehicle in the course of employment shall be covered by such insured's otherwise applicable uninsured and underinsured motorist coverage.

"(g) (1) No insurance company doing business in this state may limit the time within which any suit may be brought against it or any demand for arbitration on a claim may be made on the uninsured or underinsured motorist provisions of an automobile liability insurance policy to a period of less than three years from the date of accident, provided, in the case of an underinsured motorist claim the insured may toll any applicable limitation period (A) by notifying such insurer prior to the expiration of the applicable limitation period, in writing, of any claim which the insured may have for underinsured motorist benefits and (B) by commencing suit or demanding arbitration under the terms of the policy not more than one hundred eighty days from the date of exhaustion of the limits of liability under all automobile bodily injury liability bonds or automobile insurance policies applicable at the time of the accident by settlements or final judgments after any appeals.

"(2) Notwithstanding the provisions of subdivision (1) of this subsection, in the case of an uninsured motorist claim, if the motor vehicle of a tortfeasor is an uninsured motor vehicle because the automobile liability insurance company of such tortfeasor becomes insolvent or denies coverage, no insurance company doing business in this state may limit the time within which any suit may be brought against it or any demand for arbitration on a claim may be made on the uninsured motorist provisions of an automobile liability insurance policy to a period of less than one year from the date of receipt by the insured of written notice of such insolvency of, or denial of coverage

uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334 . . . ." Although § 38a-336 (a) (1) states generally that automobile liability insurance policies must provide uninsured and underinsured motorist coverage, it provides that such coverage is governed by "the regulations adopted pursuant to section 38a-334 . . . ."

We therefore turn to General Statutes § 38a-334 (a),[10] which provides in relevant part: "The Insurance Commissioner shall adopt regulations with respect to minimum provisions to be included in automobile liability insurance policies issued after the effective date of such regulations and covering private passenger motor vehicles, as defined in subsection (e) of section 38a-363, motor vehicles with a commercial registration, as

___

by, such automobile liability insurance company."

[10] General Statutes § 38a-334 provides: "Minimum provisions in automobile liability policies. (a) The Insurance Commissioner shall adopt regulations with respect to minimum provisions to be included in automobile liability insurance policies issued after the effective date of such regulations and covering private passenger motor vehicles, as defined in subsection (e) of section 38a-363, motor vehicles with a commercial registration, as defined in section 14-1, motorcycles, as defined in section 14-1, motor vehicles used to transport passengers for hire, motor vehicles in livery service, as defined in section 13b-101, and vanpool vehicles, as defined in section 14-1, registered or principally garaged in this state. Such regulations shall relate to the insuring agreements, exclusions, conditions and other terms applicable to the bodily injury liability, property damage liability, medical payments and uninsured motorists coverages under such policies, shall make mandatory the inclusion of bodily injury liability, property damage liability and uninsured motorists coverages and shall include a provision that the insurer shall, upon request of the named insured, issue or arrange for the issuance of a bond which shall not exceed the aggregate limit of bodily injury coverage for the purpose of obtaining release of an attachment.

"(b) The commissioner, before adopting such regulations or any subsequent modifications or amendments thereof, shall consult with insurers licensed to write automobile liability insurance in this state and other interested parties. Nothing contained in such regulations or in sections 38a-334 to 38a-336a, inclusive, 38a-338 and 38a-340 shall prohibit any insurer from affording broader coverage under a policy of automobile liability insurance than that required by such regulations."

defined in section 14-1, motorcycles, as defined in section 14-1, motor vehicles used to transport passengers for hire, motor vehicles in livery service, as defined in section 13b-101, and vanpool vehicles, as defined in section 14-1, registered or principally garaged in this state. . . ." By its language, § 38a-334 (a) specifically requires the commissioner to promulgate regulations regarding, inter alia, "uninsured motorists coverages" provided by "automobile liability insurance policies . . . covering" those classes of vehicles previously enumerated in that subsection.[11] Those specific classes of motor vehicles enumerated in § 38a-334 are "private passenger motor vehicles," "motor vehicles with a commercial registration," "motorcycles," "motor vehicles used to transport passengers for hire," "motor vehicles in livery service," and "vanpool vehicles," as those vehicles are defined in their respective sections.

Section 38a-334-6 (a)[12] of the Regulations of Connecticut State Agencies provides that the uninsured motorist

---

[11] "Not only is the [insurance] commissioner obligated to adopt regulations with respect to the minimum provisions to be included in the policy of insurance issued in this state; General Statutes § 38a-334; we presume that these regulations are 'an accurate reflection of the legislative intent articulated in the statute's more general language.' *AFSCME* v. *New Britain*, 206 Conn. 465, 470, 538 A.2d 1022 (1988). This presumption is further underscored by the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., which provides for legislative oversight through the legislative regulation review committee prior to approval of the regulations. General Statutes § 4-170." *General Accident Ins. Co.* v. *Wheeler*, 221 Conn. 206, 211, 603 A.2d 385 (1992). Section 4-170 was amended by Public Acts 1999, No. 99-90.

[12] Section 38a-334-6 of the Regulations of Connecticut State Agencies provides: "Minimum provision for protection against uninsured motorists

"(a) Coverage. The insurer shall undertake to pay on behalf of the insured all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by the insured caused by an accident involving the uninsured motor vehicle. This coverage shall insure the occupants of every motor vehicle to which the bodily injury liability coverage applies. 'Uninsured motor vehicle' includes a motor vehicle insured against liability by an insurer that is or becomes insolvent.

"(b) Arbitration. The insurance may provide but not require that the issues

coverage that it requires "shall insure the occupants of every motor vehicle to which the bodily injury liability coverage applies. . . ." It is therefore necessary to refer to § 38a-334-5 of the Regulations of Connecticut State Agencies,[13] which covers liability coverage. Section 38a-

of liability as between the insured and the uninsured motorist, and the amount of damages, be arbitrated. The insurer may provide against being bound by any judgment against the uninsured motorist.

"(c) Exclusions. The insurer's obligations to pay may be made inapplicable:

"(1) To any claim which has been settled with the uninsured motorist without the consent of the insurer;

"(2) if the uninsured motor vehicle is owned by

"(A) the named insured or any relative who is a resident of the same household or is furnished for the regular use of any of the foregoing,

"(B) a self insurer under any motor vehicle law, or

"(C) any government or agency thereof;

"(3) to pay or reimburse for workers' compensation or disability benefits.

"(d) Limits of liability. The limit of the insurer's liability may not be less than the applicable limits for bodily injury liability specified in subsection (a) of section 14-112 of the general statutes, except that the policy may provide for the reduction of limits to the extent that damages have been

"(1) paid by or on behalf of any person responsible for the injury,

"(2) paid or are payable under any workers' compensation or disability benefits law, or

"(3) paid under the policy in settlement of a liability claim. The policy may also provide that any direct indemnity for medical expense paid or payable under the policy or any amount of any basic reparations benefits paid or payable under the policy will reduce the damages which the insured may recover under this coverage and any payment under these coverages shall reduce the company's obligation under the bodily injury liability coverage to the extent of the payment.

"(e) Recovery over. The insurer may require the insured to hold in trust all rights against third parties or to exercise such rights after the insurer has paid any claim, provided that the insurer shall not acquire by assignment, prior to settlement or judgment, its insured's right of action to recover for bodily injury from any third party."

[13] Section 38a-334-5 of the Regulations of Connecticut State Agencies provides: "Minimum provisions for bodily injury liability and property damage liability

"(a) Coverage. The insurer shall undertake to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage caused by accident and arising out of the ownership, maintenance or use of a motor vehicle owned or long-term leased by the named insured. The policy shall designate by explicit

## 334-5 (a) of the regulations provides that its liability

description or by appropriate reference the motor vehicles to which this coverage applies.

"(b) Defense, settlement, supplementary payments. The insurer shall defend the insured against any suit seeking damages covered by the policy, and may make such settlement of any claim or suit as it deems expedient, but the insurer shall not be obligated to defend any suit after the exhaustion of its liability by payment of judgments or settlements. The insurer shall pay, in addition to the policy limits, all expenses incurred by the insurer, premiums on attachment and appeal bonds, court costs, interest on judgments until the insurer has offered to pay its portion of the judgment, the cost of bail bonds, not to exceed one hundred dollars per bond, all expenses incurred by the insured for first aid to others at the time of the accident and other reasonable expenses, other than loss of earnings, incurred by the insured at the insurer's request. The insurer shall, upon request of the named insured, issue or arrange for the issuance of a bond which shall not exceed the aggregate limit of bodily injury coverage for the purpose of obtaining release of an attachment.

"(c) Exclusions. The insurer's obligation to pay and defend may be made inapplicable:

"(1) To liability assumed under contract;

"(2) to intentionally caused injury or damage;

"(3) to any obligation of the insured to provide workers' compensation or disability benefits or to cover liability of an employer for employee injuries;

"(4) to the use of a motor vehicle as a public or livery conveyance;

"(5) to bodily injury or property damage resulting from the radioactive, toxic explosive or other hazardous properties of source, special nuclear or byproduct material, each as defined in the Atomic Energy Act of 1954, as amended;

"(6) while the private passenger motor vehicle is used for towing a trailer, designed for use with other than a private passenger motor vehicle which is owned or hired by the insured and not covered by like insurance in the same company;

"(7) to damage to property (A) owned or transported by the insured or (B) rented to or in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control, other than property damage to a residence or private garage by a private passenger motor vehicle covered by this insurance;

"(8) to the operation of a motor vehicle by an individual or individuals specifically named by endorsement accepted by the insured, the form of which has been accepted for filing by the insurance commissioner;

"(9) to liability arising out of pollution or contamination;

"(10) to bodily injury or property damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

"(11) to bodily injury or property damage arising out of the ownership,

coverage requirements apply to *"motor vehicle[s]*

maintenance, use, loading or unloading of any

"(A) haulaway, tank truck or tank trailer or any automobile used therewith owned, hired or held for sale by the named insured;

"(B) motor vehicle (i) while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity, or

"(ii) while rented to others by the named insured unless to a salesman for use principally in the business of the named insured, or

"(iii) while being used by the insured as a public or livery conveyance or for carrying property for a charge.

"(12) To bodily injury to any passenger while occupying a motorcycle.

"(d) Insured. The insurance afforded shall apply for the benefit of the named insured and any other person or organization using the motor vehicle within the scope of his permission from the named insured, except as follows:

"(1) As respects loading or unloading of a motor vehicle, only the named insured, a lessee or borrower of the motor vehicle, or an employee of the named insured or of such lessee or borrower or organization must be an insured;

"(2) the insurance as respects any person or organization other than the named insured need not apply:

"(A) To any person or organization, or to any agent or employee hereof, employed or otherwise engaged in operating a motor vehicle sales agency, repair shop, service station, storage garage or public parking place with respect to any accident arising out of the maintenance or use of a motor vehicle in connection therewith;

"(B) to any employee other than an employee of the named insured with respect to bodily injury sustained by a fellow employee injured in the course of his employment;

"(C) (i) to any person other than an employee of the named insured while engaged in the business of his employer with respect to bodily injury to any fellow employee of such person injured in the course of his employment;

"(ii) to the owner or lessee (of whom the named insured is a sublessee) of a hired motor vehicle or the owner of a non-owned motor vehicle or any agent or employee of any such owner or lessee;

"(iii) to an executive officer of the named insured with respect to a motor vehicle owned by him or by a member of his household;

"(iv) to a motor vehicle while used with any trailer owned or hired by such person or organization and not covered by like insurance in the company (except a trailer designed for use with a private passenger motor vehicle and not being used for business purposes with another type motor vehicle), or a trailer while used with any motor vehicle owned or hired by such person or organization and not covered by like insurance in the company;

"(D) (i) to a non-owned motor vehicle used in the conduct of any partner-

owned or long-term leased by the named insured. . . ."
(Emphasis added.) The term "[m]otor [v]ehicle," as
used in the regulations, is defined as: "private passenger
motor vehicle . . . commercial motor vehicle . . .
motorcycle . . . public service motor vehicles . . .
motor vehicle in livery service . . . and vanpool vehi-
cle . . . ." Regs., Conn. State Agencies § 38a-334-2 (c).[14]
Reading §§ 38a-334 and 38a-336 together, as we must,
we proceed in our analysis with the understanding that

ship or joint venture of which the insured is a partner or member and which
is not designated in this policy as a named insured, or

"(ii) if the named insured is a partnership, to a motor vehicle owned by
or registered in the name of a partner thereof. The insurance shall apply
separately with respect to each insured against whom claim is made or suit
is brought, provided the inclusion of more than one insured shall not operate
to increase the limits of the insurer's liability.

"(e) Limits of liability. The limit of the insurer's liability shall not be less
than the applicable limits for bodily injury and property damage liability
specified in subsection (a) of section 14-112 of the general statutes. Said
limits may be stated separately with respect to bodily injury and property
damage, or a single limit of liability may be stated, provided it shall not be
less than the sum of the separate limits for bodily injury and property damage
resulting from any one accident as specified in said subsection (a). The
limits may be stated as applicable regardless of the number of insureds,
persons or organizations sustaining bodily injury or property damage, claims
made or suits brought or motor vehicles to which the policy applies. The
insurance for the liability specified in subsection (a) of section 14-112 of
the general statutes may be written subject to deductible amounts per claim
or per accident, provided an appropriate premium consideration shall be
allowed and the deductible provisions shall be clearly stated in the policy
and provided the insurer shall make full payment of all losses regardless
of reimbursement by the insured.

"(f) Subrogation. The insurer shall be subrogated to any rights of recovery
of the insured against third parties except as restricted by section 38a-369.

"(g) Other insurance. The policy may provide for proration of loss with
other insurance or may provide that insurance for persons or organizations
other than the named insured does not apply if such person or organization
has other insurance applicable to the loss with limits of liability not less
than those specified in subsection (a) of section 14-112 and, where applica-
ble, section 38a-365 of the general statutes."

General Statutes §§ 38a-369 and 38a-365 were repealed by Public Acts
1993, No. 93-297, §§ 28, 29.

[14] We note that those are the same classes of motor vehicles enumerated
in § 38a-334 (a).

only those classes of motor vehicles enumerated in § 38a-334 fall within the mandate of § 38a-336 requiring underinsured motorist coverage.

We must therefore determine whether the vehicle at issue in the present case falls within one of the enumerated classes of vehicles in § 38a-334. Specifically, we consider whether the vehicle falls within the class of "[p]rivate passenger motor vehicle[s]," as defined in § 38a-363 (e).[15] Section 38a-363 (e) defines a private passenger motor vehicle as a: "(1) Private passenger type automobile; (2) station-wagon-type automobile; (3) camper-type motor vehicle; (4) high-mileage-type motor vehicle, as defined in section 14-1; (5) truck-type motor vehicle with a load capacity of fifteen hundred pounds or less, registered as a passenger motor vehicle, as defined in said section, or as a passenger and commercial motor vehicle, as defined in said section, or used for farming purposes;[16] or (6) a vehicle with a commercial registration, as defined in subdivision (12) of said section. It does not include a motorcycle or motor vehicle used as a public or livery conveyance."

We constrain our analysis to whether the vehicle at issue is a private passenger motor vehicle by virtue of subdivision (6) of § 38a-363 (e); see footnote 16 of this opinion; which includes within the definition of private passenger motor vehicle "a vehicle with a commercial registration, as defined in subdivision (12) of [§ 14-1 (a)]. . . ." Section 14-1 (a) (12) provides: " 'Commercial

---

[15] With respect to whether the vehicle at issue falls within § 38a-334, the parties dispute only whether the vehicle is a private passenger motor vehicle, pursuant to subdivision (6) of § 38a-363 (e), which encompasses vehicles with a commercial registration. We, therefore, limit our analysis accordingly.

[16] The plaintiff does not claim that the vehicle at issue falls under § 38a-363 (e) (5), which brings "truck-type motor vehicle[s] with a load capacity of fifteen hundred pounds or less" within the definition of a private passenger motor vehicle. The parties stipulated that the vehicle is a "truck-type vehicle with a maximum payload of more than 4,000 pounds and less than 6,000 pounds."

registration' means the type of registration required for any motor vehicle designed or used to transport merchandise, freight or persons in connection with any business enterprise, unless a more specific type of registration is authorized and issued by the commissioner for such class of vehicle . . . ." We conclude that the definition of commercial registration does not encompass the type of registration possessed by the vehicle at issue in this case.

The first clause of § 14-1 (a) (12) sets forth a general definition, which defines "commercial registration" as "the type of registration required for any motor vehicle designed or used to transport merchandise, freight or persons in connection with any business enterprise . . . ." The second clause of § 14-1 (a) (12) then begins with language of exception, namely, the term "unless." By this language, the second clause carves out an exception to the general definition contained in the first clause. Specifically, the second clause of § 14-1 (a) (12) excepts from the general definition of commercial registration "a more specific type of registration [that] is authorized and issued by the commissioner for such class of vehicle . . . ."[17] If the term "commercial registration" were meant, as the plaintiff contends, to *include* a "more specific type of registration . . . authorized and issued by the commissioner for such class of vehicle," that language would be rendered meaningless, because the more general phrase, "the type of registration required for any motor vehicle

---

[17] The parties apparently agree with one another that the municipal registration possessed by the vehicle at issue in this case is a "more specific type of registration" and falls within the language of the latter portion of the definition of commercial registration contained in § 14-1 (a) (12). Their disagreement arises, however, over whether the term commercial registration includes or excepts such registration. We disagree with their mutual conclusion, however, because, as will be discussed, the statutory language "such class of vehicle" brings into the exception the requirement that the vehicle be designed or used in connection with a business enterprise.

designed or used to transport merchandise, freight or persons in connection with any business enterprise," would subsume the more specific. General Statutes § 14-1 (a) (12). Therefore, our treatment of the second clause as an exception does not result in redundant language and gives meaning to every clause of the statute. "It is a basic tenet of statutory construction that the legislature 'did not intend to enact meaningless provisions.' *Turner* v. *Turner*, 219 Conn. 703, 713, 595 A.2d 297 (1991). Accordingly, care must be taken to effectuate all provisions of the statute. See *Pintavalle* v. *Valkanos*, 216 Conn. 412, 418, 581 A.2d 1050 (1990) ('[a] statute should be read as a whole and interpreted so as to give effect to all of its provisions'); *Hopkins* v. *Pac*, 180 Conn. 474, 476, 429 A.2d 952 (1980) (it is a 'well established principle that statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant')." *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 100–101, 653 A.2d 782 (1995).

Finally, the phrase within the exception, "such class of vehicle," refers to "any motor vehicle designed or used to transport merchandise, freight or persons in connection with any business enterprise," contained in the first clause of § 14-1 (a) (12). Therefore, the second clause incorporates the notion that only those motor vehicles designed or used in connection with a business enterprise fall within its scope.

To summarize, we are presented with § 38a-336, which requires underinsured motorist coverage according to the regulations promulgated by the insurance commissioner pursuant to § 38a-334. Section 38a-334 (a) encompasses various classes of motor vehicles, namely, private passenger motor vehicles, motor vehicles with a commercial registration, motorcycles, motor vehicles used to transport passengers for hire, motor vehicles in livery service and vanpool vehicles. The

private passenger motor vehicle classification is defined in § 38a-363 (e) (6), which brings within the classification "a vehicle with a commercial registration, as defined in subdivision (12) of [§ 14-1 (a)]. . . ." Section 14-1 (a) (12) excepts from its general definition of commercial registration "a more specific type of registration . . . authorized and issued by the commissioner" for the class of vehicle previously described in the general definition, namely, "any motor vehicle designed or used to transport merchandise, freight or persons in connection with any business enterprise . . . ." The parties stipulated to the fact that the vehicle at issue, which possessed a municipal registration, was used by firefighters employed by the defendant to transport medical emergency equipment and technicians to emergency calls. It therefore cannot be said, nor does either party contend, that the vehicle was designed or used in connection with a business enterprise. Thus, the vehicle at issue in this case is not a "motor vehicle with a commercial registration" pursuant to § 38a-363 (e) (6), and therefore does not fall under the private passenger motor vehicle classification in § 38a-334 for which underinsured motorist coverage is mandated pursuant to § 38a-336.

The legislative history of §§ 38a-334 and 38a-336 lends further support to our conclusion that those statutes do not require the defendant to maintain underinsured motorist coverage on the vehicle at issue here. The legislative history suggests that only those classes of vehicles enumerated in § 38a-334 fall under the mandatory uninsured and underinsured motorist coverage scheme.

In 1967, the legislature enacted Public Acts 1967, No. 510, entitled "An Act Concerning Minimum Provisions for Private Passenger Automobile Liability Insurance Policies." This legislation, later codified at §§ 38a-334

through 38a-336, 38a-338 and 38a-340,[18] required uninsured motorist coverage in all automobile liability insurance policies covering private passenger automobiles. In 1979, the legislature amended General Statutes (Rev. to 1979) § 38-175c, now § 38a-336, to mandate the inclusion of underinsured motorist coverage. See Public Acts 1979, No. 79-235.

In 1971, the legislature amended General Statutes (Sup. 1969) § 38-175a, now § 38a-334, to add insurance policies covering commercial motor vehicles to the ambit of the statute. See Public Acts 1971, No. 364. In 1985, the legislature further amended General Statutes (Rev. to 1985) § 38-175a, now § 38a-334, to include within its mandate insurance policies covering motorcycles, public service motor vehicles, motor vehicles in livery service, and vanpool vehicles. See Public Acts 1985, No. 85-12.[19] The history of this amendment demonstrates that "[t]he apparent purpose of No. 85-12 of the 1985 Public Acts was . . . to extend to the insurance commissioner the ability to authorize regulations, including the mandatory inclusion of uninsured motorists coverages, for [inter alia] motorcycle policies, where no such authority existed before. By so amending the statute, the legislature further mandated that such policies include underinsured motorist coverage . . . ." *Beloff* v. *Progressive Casualty Ins. Co.*, 203 Conn. 45, 61, 523 A.2d 477 (1987). "[T]his bill would require the [i]nsurance [c]ommissioner to adopt regulation establishing a minimum provision to be included in motorcycle liability policies and commercial automobile liability policies covering public and livery conveyances. Motorcycles and public and livery conveyances

[18] This legislation originally was codified at General Statutes (Cum. Sup. 1967) §§ 38-175a through 38-175e, and later was renumbered to §§ 38a-334 through 38a-336, 38a-338 and 38a-340. For clarity, unless otherwise indicated, we refer throughout this opinion to the current revision of these statutes.

[19] Public Act 85-12 also changed "private passenger automobiles" to "private passenger motor vehicles."

already are subject to the State mandatory liability insurance law, but unlike private passenger vehicles, *no minimum provisions for such policies have been established.*" (Emphasis added.) 28 S. Proc., Pt. 3, 1985 Sess., p. 763, remarks of Senator Donald E. Schoolcraft. "This bill and its amendment is simply intended to *give the [i]nsurance [c]ommissioner the ability to draft the amount of liability coverage that should be carried for the vehicles that are defined in the amendment.* What the amendment does is refer to those areas of the statutes, in which the vehicles we refer to are defined. The commissioner will then come up with the amount of liability that must be covered and will notify those who must carry the insurance. As you'll remember last year, we required that motorcycles carry liability insurance. We did not, however, determine how much they must carry, and as with auto coverage, the commissioner himself determines the minimum amount of coverage that a person must have. *What this does is it gives him the ability to also regulate these other areas.*" (Emphasis added.) 28 H.R. Proc., Pt. 5, 1985 Sess., pp. 1575–76, remarks of Representative Morag L. Vance. The legislative history supports our conclusion that only those insurance policies covering those classes of motor vehicles expressly enumerated in § 38a-334 must provide underinsured motorist coverage. In this connection, it is significant that the legislature has not chosen to include the particular emergency vehicle at issue in the present case within the classes of motor vehicles covered by § 38a-334.

Our conclusion is consistent with this court's decision and underlying rationale in *Beloff* v. *Progressive Casualty Ins. Co.*, supra, 203 Conn. 45. In *Beloff*, a consolidated appeal, the insureds, each of whom was injured while operating a motorcycle and struck by another motor vehicle, claimed that General Statutes (Rev. to 1983) §§ 38-175a through 38-175e, now §§ 38a-

334 through 38a-336, 38a-338 and 38a-340, applied to the insurance policies covering the operated motorcycles so as to require the inclusion of uninsured and underinsured motorist coverage. *Beloff* v. *Progressive Casualty Ins. Co.*, supra, 52–53. The applicable statute, General Statutes (Rev. to 1983) § 38-175a, provided in relevant part that it applied to those insurance policies "covering private passenger automobiles and commercial motor vehicles, as defined in subsection (7) of section 14-1 . . . ." On the basis of the statutory language and legislative history of the underinsured motorist statute, we concluded that a motorcycle was not a private passenger motor vehicle. *Beloff* v. *Progressive Casualty Ins. Co.*, supra, 55–61. We further concluded that, because at the relevant times, motorcycles did not fall within any class of motor vehicles enumerated in § 38-175a, motorcycle policies were not mandated to provide uninsured and underinsured motorist coverage. Id., 62.

The plaintiff contends that the vehicle at issue in the present case is a private passenger motor vehicle pursuant to subdivision (6) of § 38a-363 (e), which brings within the scope of private passenger motor vehicles those vehicles with a commercial registration. The plaintiff argues that the term commercial registration under § 14-1 (a) (12) *"may include* 'a more specific type of registration . . . authorized and issued by the commissioner for such class of vehicle,' " and that the municipal registration possessed by the vehicle here is " 'a more specific type of registration' . . . ." (Emphasis added.) The plaintiff also argues that the business enterprise language in the first clause of the definition of commercial registration pursuant to § 14-1 (a) (12) is inapplicable to the second clause. We disagree with the plaintiff's interpretation.

First, the plaintiff's construction deems the term "unless," as used in § 14-1 (a) (12), to mean "including." We decline to read language of exception, namely,

"unless," to be synonymous with language of inclusion. Second, the plaintiff's construction disregards the language in § 14-1 (a) (12), namely, "any motor vehicle designed or used . . . in connection with any business enterprise," and "such class of vehicle" in the latter portion of the definition, indicating that only those vehicles involved in a business enterprise are addressed by the definition of "commercial registration." Finally, even if we were to agree with the plaintiff that the second part of the definition served as an inclusion, and not as an exception, our conclusion that the vehicle at issue here is not "a vehicle with a commercial registration" pursuant to § 38a-363 (e) (6) would remain unchanged. It is our construction, which deems the term "unless" to mean "except," and not "including," that renders the last clause of the definition meaningful.

At oral argument before this court, the plaintiff claimed, for the first time, that the classification of private passenger motor vehicle in §§ 38a-334 (a) and 38a-363 (e) was drawn because of the no-fault insurance statutory scheme, which was repealed by Public Acts 1993, No. 93-297, §§ 28, 29, effective January 1, 1994. See General Statutes (Rev. to 1993) § 38a-369. In other words, in the plaintiff's view, only that class of vehicles—the private passenger motor vehicle—fell under the no-fault system.

Although the plaintiff is correct in stating that the private passenger motor vehicle classification served the no-fault scheme, the plaintiff is incorrect in asserting that this classification served only that one function. On the contrary, the classification of private passenger motor vehicle already had been implemented by the creation of the uninsured motorist statute, which predated the no-fault system. As stated previously, in 1967, the General Assembly adopted legislation mandating the inclusion of, inter alia, uninsured motorist coverage in "automobile liability insurance policies . . .

covering *private passenger automobiles* registered or principally garaged in this state. . . ." (Emphasis added.) Public Acts 1967, No. 510, § 1. By its language, that uninsured motorist legislation expressly carved out a specific class of motor vehicle, namely, "private passenger automobiles," that would fall under its ambit.

Evidence of the continued viability of the private passenger motor vehicle classification can further be found in the fact that, notwithstanding the repeal of the no-fault insurance statutory scheme, the classification was left in place. Furthermore, the classification continues to be used in the statutes in a variety of motor vehicle and insurance areas. See, e.g., General Statutes § 14-12b ("[p]resentation of insurance identification card or policy and statement that minimum security will be continuously maintained required for issuance of registration"); General Statutes § 14-12c ("[v]erification of security coverages"); General Statutes § 14-14 ("[r]egistration of motor vehicles owned by minors"; proof of financial responsibility); General Statutes § 14-15b ("[m]otor vehicle rental contracts"); General Statutes § 14-213b ("[o]peration prohibited when insurance coverage fails to meet minimum requirements"); General Statutes § 38a-9 (b) (1) ("arbitration procedure for the settlement of disputes between claimants and insurance companies concerning automobile physical damage and automobile property damage liability claims"); General Statutes § 38a-335 ("[s]tatement of coverage for rented motor vehicle"); General Statutes § 38a-364 ("[i]nsurance identification cards"); General Statutes § 38a-370 ("[r]esidual liability insurance"); General Statutes § 38a-371 ("[m]andatory security requirements"); General Statutes § 38a-372 ("[i]nsurers required to declare that policies deemed to provide required security"). We also note that the statutes to which we have just referred either were amended by Public Act 93-297, which repealed the no-fault scheme, or have been

amended since that repeal, further supporting our conclusion that the private passenger motor vehicle classification remains viable.

Furthermore, when the legislature has intended to include all motor vehicles within a statute's scope, it has expressly so provided. See, e.g., General Statutes § 14-20b (Public Acts 1998, No. 98-182, § 7, expanded category of vehicles eligible for number plates for veterans from passenger motor vehicles to all motor vehicles). It has not done so with respect to uninsured and underinsured motorist coverage.

The plaintiff also questions why the vehicle in issue here, which must comply with various safety and other motor vehicle requirements; see, e.g., General Statutes § 14-12 (f) and (h); also is not required to comply with insurance requirements. We note that the vehicle at issue must comply with all *applicable* insurance requirements.[20] We perceive the plaintiff's larger question to be, however, why *all* motor vehicles are not required to carry underinsured motorist coverage. That is a policy question for the legislature.

## II

We next consider whether the self-insurance statutes require the defendant to provide underinsured motorist coverage on the vehicle at issue here. The plaintiff first argues that, even if this court concludes that the vehicle at issue is not a private passenger motor vehicle, the defendant, as a self-insurer pursuant to §§ 14-129 and 38a-371, must provide underinsured motorist coverage

---

[20] When asked at oral argument before this court whether the defendant's position was that vehicles that are not private passenger motor vehicles are not required to carry *liability* insurance, the defendant responded that it did not matter because the employee would be indemnified by the city. In its brief, the plaintiff cited to General Statutes §§ 7-308 and 7-465 (a) pertaining to its indemnification obligations. We decline to reach the scope of the defendant's *liability* insurance requirements with respect to its motor vehicles.

for all of its "[m]otor vehicle[s]," as that term is defined in § 14-1 (a) (47).[21] We disagree.

Although this issue also requires us to consider several statutory provisions, we first look to the language of § 14-129[22] to determine whether its provisions require the defendant to provide underinsured motorist coverage for the vehicle at issue here. We note that the self-insurance statute, § 14-129, and the statute mandating uninsured and underinsured motorist coverage, § 38a-336, appear in separate chapters of the General Statutes.[23] Section 14-129 was enacted in 1951; Public Acts 1951, No. 179, §§ 17, 23; uninsured motorist coverage on all automobile liability insurance policies was mandated sixteen years later in 1967; Public Acts 1967, No. 510, §§ 1, 2, 4; and underinsured motorist coverage was mandated twenty-eight years later in 1979. Public Act 79-235. Not only does neither statutory scheme expressly refer to the other, but also § 14-129 contains no language referring to underinsured motorist coverage. We conclude that § 14-129, a statute enacted sixteen years

[21] General Statutes § 14-1 (a) (47) provides: " 'Motor vehicle' means any vehicle propelled or drawn by any nonmuscular power, except aircraft, motor boats, road rollers, baggage trucks used about railroad stations or other mass transit facilities, electric battery-operated wheel chairs when operated by physically handicapped persons at speeds not exceeding fifteen miles per hour, golf carts operated on highways solely for the purpose of crossing from one part of the golf course to another, golf cart type vehicles operated on roads or highways on the grounds of state institutions by state employees, agricultural tractors, farm implements, such vehicles as run only on rails or tracks, self-propelled snow plows, snow blowers and lawn mowers, when used for the purposes for which they were designed and operated at speeds not exceeding four miles per hour, whether or not the operator rides on or walks behind such equipment, bicycles with helper motors as defined in section 14-286, special mobile equipment as defined in subsection (i) of section 14-165 and any other vehicle not suitable for operation on a highway . . . ."

[22] See footnote 1 of this opinion for the text of § 14-129.

[23] We note that General Statutes (Rev. to 1989) § 14-128, which had exempted municipal motor vehicles from the scope of § 14-129, was repealed by Public Acts 1989, No. 89-232, § 2.

before mandatory uninsured motorist coverage and twenty-eight years before mandatory underinsured motorist coverage, does not require self-insurers to provide underinsured motorist coverage.[24]

We next turn to § 38a-371 (c)[25] in order to discern whether that statute requires the defendant to provide underinsured motorist coverage for the vehicle at issue here. We construe such provision mindful of General Statutes § 38a-388, which provides: "The provisions of sections 38a-363 to 38a-388, inclusive, shall be construed to be supplementary and not as a substitute for the provisions of chapters 246, 247 and 248 [of which title 14 is a part]. In the event of any conflict between the provisions of said sections and the provisions of chapters 246, 247 and 248, then the provisions of said chapters shall prevail." We therefore must construe § 38a-371 in a manner that permits its provisions to serve as a supplement, and not as a substitute, for the provisions of title 14.

Section 38a-371 (c) provides: "Subject to approval of the Insurance Commissioner the security required by this section, may be provided by self-insurance . . . . A person who provides security under this subsection is a self-insurer. A municipality may provide the security required under this section by filing with the commissioner a notice that it is a self-insurer." Although § 38a-371 (c) does not expressly identify the type or types of motor vehicles to which it applies, the subsection, by its language, applies to "the security required under this section," referring to § 38a-371. We therefore must identify the security required by § 38a-371.

---

[24] We reiterate that self-insurers are still subject to the underinsured motorist coverage requirements pursuant to §§ 38a-334 and 38a-336. We simply conclude that § 14-129 neither alters nor adds to those underinsured motorist coverage requirements.

[25] See footnote 2 of this opinion for the text of § 38a-371.

Subsection (a) of § 38a-371 sets forth the scope of the security required by that section. Subdivision (1) of § 38a-371 (a) provides: "The owner of a private passenger motor vehicle required to be registered in this state shall provide and continuously maintain throughout the registration period security in accordance with sections 38a-334 to 38a-343, inclusive." Subdivision (2) of § 38a-371 (a) then addresses the security required by the owner of a private passenger motor vehicle not required to be registered in this state. Reading subsections (a) and (c) together, we conclude, therefore, that the self-insurance provisions of subsection (c) apply only to the ownership of private passenger motor vehicles. As discussed previously, the vehicle at issue here is not a private passenger motor vehicle and, therefore, § 38a-371 (c) does not include within its scope insurance requirements regarding this vehicle. Our reading of § 38a-371 does not conflict with the provisions of title 14 and, therefore, is consistent with the directive in § 38a-388 to construe the provisions of title 38a in a manner that does nothing more than supplement the provisions of title 14.

We next look to the legislative history of the relevant statutes. There is nothing in the legislative history of the applicable motor vehicle and insurance statutory schemes to support the argument that the self-insurance statutes impose the requirement that the vehicle at issue here maintain underinsured motorist coverage. To the contrary, the legislative history supports our conclusion that §§ 14-129 and 38a-371 do not require the defendant to provide underinsured motorist coverage for this vehicle.

We begin with the legislative history of § 14-129. The legislature enacted § 14-129 in 1951, sixteen years before the uninsured motorist statutory scheme was enacted and twenty-eight years before the enactment of underinsured motorist coverage. Furthermore, since

its enactment in 1951, § 14-129 has not been amended. The legislature enacted Public Acts 1951, No. 179, entitled "An Act Concerning Financial Responsibility of Owners and Operators of Motor Vehicles," which was later codified in part at § 14-129. A close look at that public act reveals that the legislation was designed to address the financial responsibility of *tortfeasors*, who cause injury by virtue of their ownership, maintenance or use of a motor vehicle. See, e.g., Public Acts 1951, No. 179, §§ 5, 6, 7, 10.[26] Moreover, we previously have

[26] Public Acts 1951, No. 179, provides in relevant part: "Sec. 5. (a) If, twenty days after the receipt of a report of a motor vehicle accident within this state which has resulted in bodily injury or death, or damage to the property of any one person in excess of one hundred dollars, the commissioner does not have on file evidence satisfactory to him that *the person who would otherwise be required to file security under subsection (b) of this section has been released from liability, or has been finally adjudicated not to be liable,* or has executed a duly acknowledged written agreement providing for the payment of an agreed amount in instalments with respect to all claims for injuries or damages resulting from the accident, the commissioner shall determine the amount of security which is sufficient in his judgment to satisfy any judgment or judgments for damages resulting from such accident as may be recovered against each operator or owner. . . .

"Sec. 6. The requirements as to security and suspension specified in section 5 of this act shall not apply: (1) To the operator or the owner of a motor vehicle involved in an accident wherein no injury or damage was caused to the person or property of anyone other than such operator or owner; (2) to the operator or the owner of a motor vehicle legally parked at the time of the accident; (3) to the owner of a motor vehicle if, at the time of the accident, the vehicle was being operated without his permission, express or implied, or was parked by a person who had been operating such motor vehicle without such permission; (4) if, prior to the date that the commissioner would otherwise suspend the license and registration or nonresident's operating privilege under section 5 of this act, there shall be filed with the commissioner evidence satisfactory to him that the person who would otherwise have to file security has been released from liability or been finally adjudicated not to be liable or has executed a duly acknowledged written agreement providing for the payment of an agreed amount in instalments, with respect to all claims for injuries and damages resulting from the accident.

"Sec. 7. The license and registration and operating privilege suspended as provided in section 5 of this act shall remain so suspended and shall not be renewed nor shall any such license or registration be issued to such person until . . . (b) one year has elapsed following the date of such accident and

stated that "[t]he purpose of the legislature in enacting the financial responsibility provisions of the motor vehicle law was to keep off our highways the financially irresponsible owner or operator of an automobile who cannot respond in damages for the injuries he may inflict, and to require him, as a condition for securing or retaining a registration or an operator's license, to furnish adequate means of satisfying possible claims against him." (Internal quotation marks omitted.) *Gentile* v. *Altermatt*, 169 Conn. 267, 302, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). In sum, § 14-129 was part of the legislative effort to impose minimum liability coverage. Nothing in its history suggests that it was ever intended to trump the subsequently enacted, and more specific, provision regarding uninsured and underinsured motorist coverage.

Furthermore, when the legislature passed Modified House Bill No. 5418, eventually enacted as Public Acts 1967, No. 510, §§ 1, 2, 4, and codified at §§ 38-175a and 38-175c, now §§ 38a-334 and 38a-336, no reference was made to any preexisting uninsured motorist requirements. This absence demonstrates the legislative understanding that such requirements were not previously in

evidence satisfactory to the commissioner has been filed with him that during such period no action for damages arising out of such accident has been instituted; or (c) evidence satisfactory to the commissioner has been filed with him of a release from liability, or a final adjudication of nonliability or a duly acknowledged written agreement . . . .

"Sec. 10. Such deposit [made in compliance with the requirements of this act] or any balance thereof shall be returned to the depositor or his personal representative when evidence satisfactory to the commissioner has been filed with him that there has been a release from liability, or a final adjudication of non-liability, or a duly acknowledged agreement, in accordance with subdivision (4) of section 6 of this act, or whenever, after the expiration of one year from the date of the accident, or from the date of deposit of any security under subsection (b) of section 5 of this act, the commissioner shall be given reasonable evidence that there is no such action pending and no judgment rendered in such action left unpaid. . . ." (Emphasis added.)

place pursuant to § 14-129. See generally 12 S. Proc., Pt. 4, 1967 Sess., pp. 1956–58; 12 H.R. Proc., Pt. 8, 1967 Sess., pp. 3295–97; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1967 Sess., pp. 1006–1007; see also 12 H. Proc., supra, p. 3296, remarks of Representative Thomas C. Salamone ("[T]his bill authorizes the [insurance] commissioner to adopt regulations which would spell out minimum provisions, conditions, exclusions and definitions which appear in automobile liability policies. . . . [U]ninsured motorist [coverage] will now become a mandatory part of minimum provision policies."). The same holds true concerning the genesis of the underinsured motorist legislation, Substitute Senate Bill No. 1084, which eventually was enacted as Public Acts 1979, No. 79-235. See generally 22 S. Proc., Pt. 5, 1979 Sess., pp. 1353–54, 1369–71, 1520; 22 H.R. Proc., Pt. 16, 1979 Sess., pp. 5339–43; Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1979 Sess., pp. 81–82, 100–101, 112, 124; Conn. Joint Standing Committee Hearings, Transportation, Pt. 2, 1979 Sess., p. 338.

The legislative history of § 38a-371 also indicates that its provisions do not impose on the defendant security coverage requirements for the vehicle at issue here, but rather, are limited to policies covering private passenger motor vehicles. The most explicit legislative statement on this issue is located in the history of Senate Bill No. 226, entitled "An Act Concerning the Exemption of Municipalities from the Self-Insurance Certification Filing Requirement"—a bill eventually enacted by Public Acts 1982, No. 82-145. Public Act 82-145 amended General Statutes (Rev. to 1981) § 38-327 (c), now § 38a-371 (c), to permit municipalities that self-insure to file a notice with the insurance commissioner that they self-insure, instead of being required to comply with the more complicated filing requirements otherwise mandated by subsection (c) of § 38a-371. The legislative

history demonstrates that the requirements of § 38a-371 are limited to private passenger motor vehicles. See 25 H.R. Proc., Pt. 6, 1982 Sess., p. 1998, remarks of Representative Robert G. Jaekle ("[t]he subsection allowed self-insurance instead of providing *insurance policies for private passenger motor vehicles*" [emphasis added]).

Furthermore, "we note as a general matter that uninsured [and underinsured] motorist insurance operates upon a different set of principles from those upon which automobile liability and property insurance are premised, and that uninsured motorist insurance protects the named insured against risks that are fundamentally different from liability and property insurance. Automobile liability and property insurance covers damage to other persons or motor vehicles for which the named insured or named insured's covered motor vehicle is, at least in some measure, responsible. See R. Keeton & A. Widiss, Insurance Law (1988) § 4.8 (a), pp. 376–77 and § 4.9 (a), pp. 385–86. In contrast, the purpose of [un]insured motorist coverage is to protect the named insured and other additional insureds from suffering an inadequately compensated injury caused by an accident with an inadequately insured automobile. . . . *Florestal* v. *Government Employees Ins. Co.*, 236 Conn. 299, 305, 673 A.2d 474 (1996)." (Internal quotation marks omitted.) *Sandor* v. *New Hampshire Ins. Co.*, 241 Conn. 792, 799–800, 699 A.2d 96 (1997). "Because uninsured motorist insurance operates upon principles that are different from those on which liability and property insurance are premised"; id., 800; we do not agree with the plaintiff's claim that § 14-129 requires self-insurers to provide underinsured motorist coverage on their motor vehicles regardless of whether they fall within the underinsured motorist statute.

Finally, our conclusion is consistent with our precedent that states that "the funding mechanism by which

an owner of vehicles decides to meet the requirements of Connecticut insurance law is irrelevant to the obligation of that funding entity to comply with such requirements . . . . [S]elf-insurance is the functional equivalent of commercial insurance." *Hertz Corp.* v. *Federal Ins. Co.*, 245 Conn. 374, 378 n.4, 713 A.2d 820 (1998); see also *Conzo* v. *Aetna Ins. Co.*, 243 Conn. 677, 686, 705 A.2d 1020 (1998) ("[t]he legislature intended to create a uniform scheme of uninsured motorist insurance coverage applicable to self-insurers as well as commercial insurance carriers"). Just as we do not base our conclusion—that the defendant is not required to provide underinsured motorist coverage for the vehicle at issue here—on the defendant's status as a self-insurer, we do not impose on the defendant additional underinsured motorist requirements because of that same status.[27]

The plaintiff argues that § 38a-371 (c) does not specify any particular type of motor vehicles to which it applies. As our statutory analysis reveals, however, § 38a-371 (c), which refers to the security required by § 38a-371, applies to private passenger motor vehicles.

The plaintiff also argues that because the self-insurance plan of the defendant covered the vehicle at issue here, all vehicles under the plan must be provided the same coverage. In support of this proposition the plaintiff cites to the "uniform scheme of protection" discussed in *Conzo* v. *Aetna Ins. Co.*, supra, 243 Conn.

[27] Of course, an insurer, including a self-insurer; see General Statutes § 38a-363 (b); may provide greater protection than that required by the insurance statutes. See General Statutes § 38a-334 (b) ("[n]othing contained in such regulations or in sections 38a-334 to 38a-336a, inclusive, 38a-338 and 38a-340 shall prohibit any insurer from affording broader coverage under a policy of automobile liability insurance than that required by such regulations"); *Norfolk & Dedham Mutual Fire Ins. Co.* v. *Wysocki*, 243 Conn. 239, 241, 702 A.2d 638 (1997); *American Motorists Ins. Co.* v. *Gould*, 213 Conn. 625, 634, 569 A.2d 1105 (1990), overruled in part on other grounds, *Covenant Ins. Co.* v. *Coon*, 220 Conn. 30, 37, 594 A.2d 977 (1991).

686, and § 14-129 (a). As discussed previously, however, the uniform scheme of protection articulated in *Conzo* concerned the uniform treatment between a self-insurer and a commercial insurance carrier. Our conclusion does not alter that scheme. With respect to § 14-129 (a), the plaintiff has pointed to no statutory language or legislative history that suggests that all motor vehicles covered by a self-insurance plan must be treated alike for all purposes of insurance.

Finally, the plaintiff argues that the conclusion we reach today violates § 38a-388. Section 38a-388 provides that in the event of any conflict between title 38a and title 14, the provisions of title 14 predominate, and that all motor vehicles, as defined in § 14-1 (a) (47), fall within the scope of § 14-129. As discussed previously, however, we have not removed, by virtue of any provision in title 38a, any underinsured motorist requirement that existed pursuant to title 14. Instead, we have construed title 38a as a supplement to, and not a substitute for, title 14.

The first certified question is answered: No. We need not answer the other certified questions.

No costs shall be taxed in this court to either party.

In this opinion KATZ, SULLIVAN and VERTEFEUILLE, Js., concurred.

MCDONALD, C. J., dissenting. I disagree with the majority opinion and would construe General Statutes § 38a-334 to require the defendant, whose municipal truck the plaintiff was operating, to afford the plaintiff uninsured and underinsured motorist protection.

Section 38a-334 (a) requires such coverage for private passenger motor vehicles, as defined in General Statutes § 38a-363 (e), including "motor vehicles with a commercial registration, as defined in section 14-1 . . . ." General Statutes § 14-1 (a) (12) defines " '[c]om-

mercial registration' " to mean "the type of registration required for any motor vehicle designed or used to transport merchandise, freight or persons in connection with any business enterprise, unless a more specific type of registration is authorized and issued for such class of vehicle . . . ." Common experience teaches us that the defendant's Ford Yankee coach F-350, which was equipped with a Ford Ambulance Preparation Package, was designed to carry persons and loads in connection with business enterprises, and it therefore falls under the statutory definition. Because "no part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . [so that] no word [or phrase] in a statute is to be treated as superfluous"; (internal quotation marks omitted) *State* v. *Payne*, 240 Conn. 766, 771–72, 695 A.2d 525 (1997); we should consider every word in the statute, including the word "designed" found in § 14-1 (a) (12).

The type of registration "required for" the vehicle at issue here was the one that was in fact issued by the commissioner of motor vehicles, a municipal number plate as provided by General Statutes § 14-12 (k).[1] I would conclude that the exception contained in § 14-1 (a) (12), which exempts from the general definition of "commercial registration" a more specific type of registration that is authorized and issued by the commissioner for such class of vehicle, does not apply to a truck with a municipal number plate. I do so because municipal plates are authorized and issued to all classes of municipal motor vehicles, including sedans, station wagons, and trucks of all kinds. I would interpret the

---

[1] General Statutes § 14-12 (k) provides in relevant part: "[T]he commissioner shall issue to a municipality, as defined in section 7-245, or a regional solid waste authority comprised of several municipalities, upon receipt of an application by the municipality or regional solid waste authority, a general distinguishing number plate for use on a motor vehicle owned or leased by such municipality or regional solid waste authority."

exception contained in § 14-1 (a) (12) to refer only to "class[es] of vehicle[s]" for which the commissioner authorized and issued a specific type of registration such as those found in General Statutes § 14-25a (certain construction equipment); General Statutes § 14-25b (special mobile equipment); and General Statutes § 14-26 (motor or service buses, taxicabs, school buses, motor vehicles in livery service and school buses used in part in livery service).

The majority's construction of § 38a-334 leads to a result where the plaintiff would have been covered while driving "a private passenger motor vehicle" such as a sedan, station wagon or a light pickup truck owned by the defendant, but he is not covered here because the municipal vehicle was a heavier truck. We should not conclude that the legislature intended such a result. Our interpretation should be consistent with the primary intent of uninsured and underinsured motorist coverage legislation. "We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." *Turner* v. *Turner*, 219 Conn. 703, 713, 595 A.2d 297 (1991). That intent, we have recognized, is to make uninsured and underinsured motorist protection available to the broadest number of accident victims. See *Harvey* v. *Travelers Indemnity Co.*, 188 Conn. 245, 250–51, 449 A.2d 157 (1982) ("it is the intent of the legislature to provide broad coverage to victims of uninsured motorists").

This decision exempts every heavy municipal truck from required coverage and deprives a great number of accident victims of that coverage.

Accordingly, I respectfully dissent.