JOSEPH GIAIMO *v.* CITY OF NEW HAVEN ET AL.
(SC 16460)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued March 20—officially released August 14, 2001

*Jason M. Dodge,* for the appellants (named defendant et al.).

*Gregory T. D'Auria,* associate attorney general, with whom were *William J. McCullough,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Mee C. Wong,* assistant attorney general, for the appellee (defendant second injury fund).

### Opinion

SULLIVAN, C. J. This is an appeal from a decision by the compensation review board (board) involving an attempt of the defendant employer, the city of New Haven (city), to transfer liability for a workers' compensation claim to the defendant second injury fund (fund) pursuant to General Statutes (Rev. to 1987) § 31-349, as

amended by Public Acts 1988, No. 88-40.[1] The principal

[1] At the time the city filed notice of its intent to transfer liability to the fund, General Statutes (Rev. to 1987) § 31-349, as amended by Public Acts 1988, No. 88-40, provided: "(a) The fact that an employee has suffered previous disability, or received compensation therefor, shall not preclude him from compensation for a later injury, nor preclude compensation for death resulting therefrom. If an employee who has previously incurred, by accidental injury, disease or congenital causes, total or partial loss of, or loss of use of, one hand, one arm, one foot or one eye, or who has other permanent physical impairment, incurs a second disability by accident or disease arising out of and in the course of his employment, resulting in a permanent disability caused by both conditions which is materially and substantially greater than that which would have resulted from the second injury alone, he shall receive compensation for the entire amount of disability, including total disability, less any compensation benefits payable or paid with respect to the previous disability, and necessary medical care, as elsewhere provided in this chapter, notwithstanding the fact that part of such disability was due to prior accidental injury, disease or congenital causes. The employer by whom the employee is employed at the time of the injury, or his insurance carrier, shall in the first instance pay all awards of compensation and all medical expenses provided by this chapter for the first one hundred four weeks of disability. As a condition precedent to the liability of the second injury fund, the employer or his insurance carrier shall, ninety days prior to the expiration of the one-hundred-four-week period, notify the custodian of the second injury fund of the pending case and shall furnish to said custodian a copy of the agreement or award together with all information purporting to support his claim as to the liability of the second injury fund, and shall make available to the custodian all medical reports as the custodian shall desire. Failure on the part of the employer or the carrier to comply does not relieve the employer or carrier of its obligation to continue furnishing benefits under the provisions of this chapter. In the event the custodian shall reject the claim of the employer and its insurer, the question shall be submitted to the commissioner having jurisdiction, as promptly as possible, and the employer or carrier shall continue furnishing benefits until the outcome is finally decided, and if the employer or carrier prevails all payments made beyond the one-hundred-four-week period shall be reimbursed to the employer or carrier by the second injury fund. After the employer or its insurer has completed the payment for the one-hundred-four-week period, he shall file with the commissioner having jurisdiction, and with the custodian of the second injury fund, a form indicating that all compensation and medical bills have been paid for the one-hundred-four-week period, and indicating thereon the date the custodian was notified of the pending case. Thereafter all responsibility for compensation and medical treatment shall be with the custodian of the second injury fund. If the subsequent injury of such an employee resulting from an accident arising out of and in the course of his employment shall

issue to be resolved is whether Public Acts 1995, No. 95-277, § 4 (a) (P.A. 95-277), codified at General Statutes § 31-349c (a),[2] violates the employer's right to due pro-

result in the death of the employee, and it shall be determined that either the injury or death would not have occurred except for such preexisting permanent physical impairment, the employer or his insurance carrier shall, in the first instance, pay the funeral expense described in this chapter, and shall pay death benefits as may be due for the first one hundred four weeks. Ninety days prior to the expiration of the one-hundred-four-week period, the employer or his insurance carrier shall notify the custodian of the second injury fund of the pending case and shall furnish to said custodian a copy of the agreement or award. After the employer or its insurer has completed the payment for the one-hundred-four-week period, he shall file with the commissioner having jurisdiction, and with the custodian of the second injury fund, a form indicating that all compensation has been paid for the one-hundred-four-week period, and indicating thereon the date that the custodian was notified of the pending case. Thereafter all responsibility for compensation shall be with the custodian of the second injury fund. Employees shall not be denied any of the benefits provided by any provisions of this chapter by reason of the execution of an acknowledgment of physical defect, but the benefits specified in this chapter which would be payable except for the execution of such acknowledgment shall be paid entirely out of the second injury fund. Claims for such benefits shall be filed with the commissioner, who shall refer such claims to the custodian of the second injury fund as specified above. The custodian of the second injury fund may make payment by way of final settlement in any matter concerning the fund, subject to the approval of the commissioner, when it is for the best interests of the injured employee.

"(b) In any case where workers' compensation payments to an individual for total incapacity under the provisions of section 31-307 continue for more than one hundred four weeks, the cost of accident and health insurance or life insurance coverage required under section 31-284b shall be paid to the employer as reimbursement out of the second injury fund after the one hundred fourth week. As a condition precedent to the liability of the second injury fund, the employer shall, no earlier than sixty days prior to the expiration of the one-hundred-four-week period, notify the custodian of the second injury fund that such payment is required. The employer shall also furnish to said custodian all information purporting to support the claim as to liability of the second injury fund, and shall make available to the custodian all medical reports as the custodian shall request. The fund's liability for the costs of such coverage shall begin sixty days after the date the custodian is so notified. Failure on the part of the employer to comply does not relieve the employer of its obligation to continue furnishing benefits under the provisions of section 31-284b."

[2] General Statutes § 31-349c (a) provides: "The custodian of the Second Injury Fund and an insurer or self-insured employer seeking to transfer a

cess under the fourteenth amendment to the United States constitution[3] and article first, §§ 8[4] and 10,[5] of the constitution of Connecticut. We conclude that it violates both the federal constitution and the state constitution.[6] Accordingly, we reverse the board's decision affirming the denial by the workers' compensation com-

claim to the fund shall submit all controverted issues regarding the existence of a previous disability under section 31-349 to the chairman of the Workers' Compensation Commission. The chairman shall appoint a panel of three physicians, as defined in subdivision (17) of section 31-275, and submit such dispute to the panel, along with whatever evidence and materials he deems necessary for consideration in the matter. The panel may examine the claimant, who shall submit to any examination such panel may require. Within sixty days of receiving the submission, the panel shall file its opinion, in writing, with the chairman, who shall forward it, along with any records generated by the panel's work on the case, to the commissioner having jurisdiction over the claim in which the dispute arose. The panel's opinion shall be determined by a majority vote of the three members. Such opinion shall be binding on all parties to the claim and may not be appealed to the Compensation Review Board pursuant to section 31-301."

[3] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[4] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[5] Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[6] This court has held that "the due process clause of the Connecticut constitution shares but is not limited by the content of its federal counterpart." (Internal quotation marks omitted.) *State* v. *Morales*, 232 Conn. 707, 717–18, 657 A.2d 585 (1995). The city argues that, in this case, the state constitution provides greater protection than the federal constitution. In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we enumerated six factors to be considered in determining such a claim. "Before undertaking a *Geisler* analysis, however, we ordinarily would conclude, as a necessary predicate, that [§ 31-349c (a)] could withstand scrutiny under traditional [due process] analysis. . . . Because we conclude that [§ 31-349c (a)] fails under traditional federal and state [due process] principles, it is unnecessary to consider whether, under *Geisler*, the state [due process] provision affords greater protection in this situation than the federal [due process] provision." (Citations omitted.) *City Recycling, Inc.* v. *State*, 257 Conn. 429, 444, 778 A.2d 77 (2001).

missioner (commissioner) of the city's motion for a formal hearing, and remand the case to the board with direction to remand it to the commissioner for a hearing consistent with the requirements of due process.

The record reveals the following relevant facts: The plaintiff, Joseph Giaimo, sustained a compensable acute anteroseptal myocardial infarction (heart attack) on December 28, 1987, while employed by the city as a police officer. The plaintiff and the city subsequently entered into a voluntary agreement establishing the compensability of the injury, which was approved by the commissioner on June 22, 1988. On June 1, 1989, a permanent partial disability award for 50 percent of the heart was entered by the commissioner.

In June, 1988, the city gave notice to the fund of its claim seeking a transfer of liability to the fund pursuant to § 31-349. The city claimed that the fund was liable because the plaintiff had a previous heart condition that had contributed to his heart injury. The fund denied the claim and, pursuant to the statute, the city submitted the claim to the workers' compensation commission (commission).

After the city had submitted the claim to the commission, but before the commissioner had issued a decision on the claim, the legislature enacted P.A. 95-277, which made several changes to § 31-349 as it then existed, including the elimination of the parties' rights to a formal hearing before the commissioner to determine the transferability of a claim and to appeal an adverse decision rendered in that proceeding. Specifically, P.A. 95-277, § 4, codified at § 31-349c (a), provides in relevant part: "The custodian of the Second Injury Fund and an insurer or self-insured employer seeking to transfer a claim to the fund shall submit all controverted issues regarding the existence of a previous disability under section 31-349 . . . to the chairman of the Workers'

Compensation Commission. The chairman shall appoint a panel of three physicians, as defined in subdivision (17) of section 31-275 . . . and submit such dispute to the panel, along with whatever evidence and materials he deems necessary for consideration in the matter. The panel may examine the claimant, who shall submit to any examination such panel may require. Within sixty days of receiving the submission, the panel shall file its opinion, in writing, with the chairman, who shall forward it, along with any records generated by the panel's work on the case, to the commissioner having jurisdiction over the claim in which the dispute arose. The panel's opinion shall be determined by a majority vote of the three members. Such opinion shall be binding on all parties to the claim and may not be appealed to the Compensation Review Board pursuant to section 31-301 . . . ."

Pursuant to P.A. 95-277, § 4, the chairman of the commission assigned the pending claim to a panel of three physicians, consisting of Leonard Kemler, a cardiovascular and thoracic surgeon, John Basile, a neurosurgeon, and Leo Willett, an orthopedic surgeon. The city submitted medical records to the panel along with a memorandum in which it argued that the records showed that the plaintiff had preexisting coronary artery disease that had materially and substantially affected his disability. Included in the records was a June 7, 1992 report from the plaintiff's treating physician, Andrew Drakonakis, stating that "[he] specifically disagree[d] with the notion that [his] letter [dated September 24, 1992] implied that there was a 'remote' relationship between the pre-existing coronary artery disease and the work activities which precipitated the heart attack. On the contrary, [his] opinion [was] that the pre-existence of coronary artery disease was the necessary substrate upon which the work activities acted as a catalyst that precipitated the heart attack."

Also included was an April 18, 1997 report from Drakonakis stating that "[he] would therefore agree that the term 'material and substantial' can be used to describe the contribution of [the plaintiff's] preexisting coronary artery disease to the precipitation of his heart attack."

Basile and Willett conducted a physical examination of the plaintiff on November 12, 1998. Kemler was unable to attend the examination because he had been called away on an emergency. On the same day as the examination, the panel issued its report. The report stated that the panel had reviewed "[a] report from Andrew C. Drakonakis, M.D. of Branford, Connecticut, dated June 7, 1990 [sic], which notes, 'there was a "remote" relationship between the pre-existing coronary artery disease and the work activities which precipitated the heart attack.' " The report concluded that "[i]t is our expert professional opinion that the [plaintiff] did not have a previous medical condition at the time of his injury on December 28, 1987, therefore, there was no prior injury to cause a materially and substantially greater disability, combined with the injury of December 28, 1987, than that which would have occurred due to the subsequent injury alone.

"Although arthrosclerosis is a slowly progressive condition, the claimant had no symptoms prior to the episode culminating in his myocardial infarction on December 28, 1987. We believe the claimant had no previous disability or pre-existing physical impairment. We believe his clinical condition is due solely to the injury of December 28, 1987."

On March 9, 1999, the city filed a motion for a formal hearing with the commission, in which it argued that the claim should be governed by the version of § 31-349 in place at the time of the injury, and, therefore, that the city was entitled to a formal hearing before the commissioner on the question of whether the plaintiff

had incurred a second injury for purposes of the statute.[7] The city also argued that a denial of a hearing would constitute a deprivation of property without due process in violation of the federal and state constitutions.

On April 12, 1999, the fund filed a motion to dismiss the city's motion for a formal hearing, arguing that P.A. 95-277 applied retroactively, and that the commission lacked jurisdiction to rule on the city's constitutional claim. On April 14, 1999, the commissioner held a hearing on the city's motion for a formal hearing and denied the motion.

On April 20, 1999, the city filed a petition for review of the commissioner's ruling with the board. The board affirmed the commissioner's ruling on May 22, 2000, holding that it had no authority to determine constitutional issues. The city appealed from the board's ruling to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).[8]

---

[7] This court held in *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 303, 695 A.2d 1051 (1997), that P.A. 95-277, § 4, which was ultimately codified at § 31-349c, was intended to apply retroactively to transfer claims in which a claimant's second injury occurred before July 1, 1995. Accordingly, the retroactivity of P.A. 95-277 is not an issue in this appeal.

[8] We note that a strong argument can be made that, because the commissioner and the board did not have jurisdiction to consider the city's constitutional claim; see *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 342–44, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985); *Tufaro* v. *Pepperidge Farm, Inc.*, 24 Conn. App. 234, 236, 587 A.2d 1044 (1991); this court does not have jurisdiction to entertain the city's appeal. Thus, it could be argued that the city should be required to challenge the constitutionality of the statute in a declaratory judgment action filed in the Superior Court. We recognize that this court previously has heard an appeal from the board on a constitutional issue. See *Caldor, Inc.* v. *Thornton*, supra, 336; see also *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 308–309, 695 A.2d 1051 (1997) (strongly suggesting that this court would hear constitutional challenge to § 31-349c when claim was ripe). In those cases, however, we did not address the question of why we had jurisdiction to entertain appeals from the board on issues that the board had no jurisdiction to consider.

The city argues on appeal that: (1) § 31-349c (a) deprives it of a protected property interest without due process of law in violation of both the federal and state constitutions; and (2) the statute is unconstitutionally

We also note that this court previously has considered a constitutional question reserved by the board to the Appellate Court pursuant to General Statutes § 31-324, which subsequently was transferred to this court. See *Barton* v. *Ducci Electrical Contractors, Inc.*, 248 Conn. 793, 730 A.2d 1149 (1999). Section 31-324 provides in relevant part that "[w]hen, in any case arising under the provisions of this chapter, the Compensation Review Board is of the opinion that the decision involves principles of law which are not free from reasonable doubt and which public interest requires shall be determined by the Appellate Court, in order that a definite rule be established applicable to future cases, said Compensation Review Board may, on its own motion and without any agreement or act of the parties or their counsel, reserve such case for the opinion of the Appellate Court. . . ." We did not address the jurisdictional question in *Barton*, however, and, in any event, the constitutional question was not reserved by the board to the Appellate Court in this case.

We further note that an appeal from the board on an issue that the board has no jurisdiction to consider may raise serious practical problems. Until 1979, appeals from decisions of the commissioner were brought to the Superior Court. In 1979, the legislature enacted Public Acts 1979, No. 79-540, which created the compensation review board, then called the compensation review division, and provided that appeals from the board would be brought to the appellate session of the Superior Court. Public Acts 1983, No. 83-29, deleted the reference to the appellate session of the Superior Court, and provided that appeals would be brought to the Appellate Court. During the debate on the bill that ultimately was enacted as P.A. 79-540, Representative Robert G. Jaekle urged rejection of the bill, pointing out that an appellate court is "ill-equipped and inexperienced to handle administrative appeals," which traditionally have been heard by the trial court. 22 H.R. Proc., Pt. 30, 1979 Sess., p. 10,460. We note that Representative Jaekle's misgiving is not necessarily well founded when the board has jurisdiction to consider an appeal from a decision by the commissioner analogous to the Superior Court's jurisdiction to hear administrative appeals, and the commissioner, therefore, can find facts and both the commissioner and the board can create a record adequate for appellate review. When a legal question that neither the board nor the commissioner has jurisdiction to consider has arisen, however, it is questionable, for practical as well as legal reasons, whether an appeal to the Appellate Court, as opposed to an independent action in the Superior Court, is the appropriate method to obtain judicial review of the question.

We conclude, however, that, in this case, because the constitutional issue is ripe; see *Hall* v. *Gilbert & Bennett Mfg. Co.*, supra, 241 Conn. 308 (conclud-

vague and overbroad in violation of due process require-
ments of both the federal and state constitutions. The
fund counters that the statute is constitutionally sound
and argues that this appeal should be dismissed as moot
under General Statutes § 31-349h.[9] We conclude that
the appeal is not moot, and we agree with the city that
the procedures provided by § 31-349c (a) violate the
city's due process rights under the federal and state
constitutions. Accordingly, we do not reach the city's
second claim.

I

We first address the fund's claim that this appeal
is moot. The fund argues that, under § 31-349h, the
commissioner lacks subject matter jurisdiction to order
a transfer to the fund after July 1, 1999. Since that date
has passed, the fund argues, this court can grant no
practical relief to the city, and its claim is, therefore,
moot. We disagree.

"Mootness implicates [this] court's subject matter
jurisdiction and is thus a threshold matter for us to
resolve. . . . It is a well-settled general rule that the
existence of an actual controversy is an essential requi-
site to appellate jurisdiction; it is not the province of
appellate courts to decide moot questions, discon-
nected from the granting of actual relief or from the
determination of which no practical relief can follow.
. . . An actual controversy must exist not only at the

ing that constitutional challenge to § 31-349c was not ripe because claim
had not yet been submitted to physician panel); because the claim is a pure
legal claim and the record is adequate for appellate review, and, finally,
because nothing but delay would be achieved by requiring the city to bring
a declaratory judgment action in the Superior Court, we will consider the
city's challenge to the constitutionality of the statute.

[9] General Statutes § 31-349h provides: "All transfers of claims to the Sec-
ond Injury Fund with a date of injury prior to July 1, 1995, shall be effected
no later than July 1, 1999. All claims not transferred to the Second Injury
Fund, on or before July 1, 1999, shall remain the responsibility of the
employer or its insurer."

time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *State* v. *Daniels*, 248 Conn. 64, 70, 726 A.2d 520 (1999).

Whether the commissioner has subject matter jurisdiction under § 31-349h to transfer a claim to the fund after July 1, 1999, is a matter of statutory interpretation. "It is axiomatic that the process of statutory interpretation involves a reasoned search for the intention of the legislature." *In re Valerie D.*, 223 Conn. 492, 512, 613 A.2d 748 (1992); *Lauer* v. *Zoning Commission*, 220 Conn. 455, 459–60, 600 A.2d 310 (1991). "In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994).

"It is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions. *Turner* v. *Turner*, 219 Conn. 703, 713, 595 A.2d 297 (1991). Accordingly, care must be taken to effectuate all provisions of the statute. See *Pintavalle* v. *Valkanos*, 216 Conn. 412, 418, 581 A.2d 1050 (1990) ([a] statute should be read as a whole and interpreted so as to give effect to all of its provisions); *Hopkins* v. *Pac*, 180 Conn. 474, 476, 429 A.2d 952 (1980) (it is a well established principle that statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant). *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 100–101, 653 A.2d 782 (1995)."

(Internal quotation marks omitted.) *Willoughby* v. *New Haven*, 254 Conn. 404, 422, 757 A.2d 1083 (2000).

"We are constrained to read a statute as written; *Ganim* v. *Roberts*, 204 Conn. 760, 763, 529 A.2d 194 (1987); and we may not read into clearly expressed legislation provisions which do not find expression in its words . . . . *International Business Machines Corporation* v. *Brown*, 167 Conn. 123, 134, 355 A.2d 236 (1974)." (Internal quotation marks omitted.) *Ghent* v. *Planning Commission*, 219 Conn. 511, 515, 594 A.2d 5 (1991). "Finally, in seeking to ascertain the intent of the legislature . . . we are guided by the golden rule of statutory interpretation . . . that the legislature is presumed to have intended a reasonable, just and constitutional result." (Internal quotation marks omitted.) *Kulig* v. *Crown Supermarket*, 250 Conn. 603, 608, 738 A.2d 613 (1999).

The fund's claim requires us to resolve an apparent inconsistency in the statutes governing the fund. Section 31-349 (f) provides that "[n]o claim, where the custodian of the Second Injury Fund was served with a valid notice of intent to transfer under this section, shall be eligible for transfer to the Second Injury Fund unless all requirements for transfer, including payment of the one hundred and four weeks of benefits by the employer or its insurer, have been completed prior to July 1, 1999. All claims . . . *not eligible for transfer* to the fund on or before July 1, 1999, will remain the responsibility of the employer or its insurer." (Emphasis added.) Section 31-349h, however, provides that "[a]ll transfers of claims to the Second Injury Fund with a date of injury prior to July 1, 1995, shall be effected no later than July 1, 1999. All claims not transferred to the Second Injury Fund, on or before July 1, 1999, shall remain the responsibility of the employer or its insurer."

Under the fund's interpretation of § 31-349h, any claim for a transfer to the fund that was not resolved

by July 1, 1999, was effectively terminated on that date by operation of the statute. Thus, the fund argues that the statute effectively terminated any claim seeking a transfer to the fund where an appeal from a ruling by the commissioner to the board, or an appeal from a ruling by the board to the Appellate Court, was pending on July 1, 1999.

The city, pointing to § 31-349 (f), responds that § 31-349h should apply only to claims that were not *eligible* for transfer prior to July 1, 1999, not to claims where eligibility was in dispute as of that date. Therefore, if this court determines that the claim should have been transferred to the fund before July 1, 1999, the fact that the appeal process could not be completed before that date should not bar the transfer.

Thus, the city urges us to resolve the inconsistency in the statutes by reading words into § 31-349h, so that it provides, in effect, that "all claims not *eligible to be* transferred to the Second Injury Fund, on or before July 1, 1999, shall remain the responsibility of the employer or its insurer." On the other hand, the fund's interpretation would require us to ignore the eligibility language of § 31-349 (f). We further note that, under either interpretation, the two sections are redundant. The legislative history of these statutes, both of which were enacted as part of Public Acts 1996, No. 96-242, provides no guidance as to which interpretation is correct.

Although this court is reluctant either to read words into a statute that are not there; see *Ghent* v. *Planning Commission*, supra, 219 Conn. 515; or to construe a statute so as to render any part thereof meaningless; see *Willoughby* v. *New Haven*, supra, 254 Conn. 422; we conclude for the following reasons that, in this case, the former course is preferable. We therefore agree with the city's interpretation of § 31-349h.

This court previously has not addressed the mootness issue raised by the fund in this case.[10] The board, however, previously has considered whether "parties seeking transfer [of a claim to the fund are required by § 31-349 (f)] to ensure that the decisionmaking or appeal process has been completed by July 1, 1999 . . . ." *Kuban* v. *Bridgeport Hospital,* Compensation Review Board, Case No. 03926 CRB 04-98-11 (September 23, 1999). The board concluded that "[i]mposing this restriction would unfairly burden not only employers or insurers; it would also place untenable time constraints on workers' compensation commissioners, this board, the Appellate Court, and the Supreme Court, and would deprive the parties of thoughtful, well-considered decisions and appellate review." Id.

Although we recognize that the board in *Kuban* did not address the language of § 31-349h, or attempt to reconcile that section with its reading of § 31-349 (f), we are persuaded by the board's reasoning that the legislature did not intend for § 31-349h to impose a requirement that the resolution of transfer claims must be completed by July 1, 1999, or be barred. First, we note that the first sentence of § 31-349 (f), which provides that no claim shall be eligible for transfer to the fund *unless* all requirements for transfer have been completed prior to July 1, 1999, strongly suggests that, if all such requirements—which do not include final resolution of the claim—*have* been completed by that date, the claim *shall* be eligible for a transfer. If the legislature had meant to terminate all claims, including those where the requirements for a transfer had been

---

[10] We have, however, had occasion to consider the provisions of Public Acts 1996, No. 96-242 that are codified at § 31-349 (f) and § 31-349h. In *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 301, 695 A.2d 1051 (1997), we stated that those provisions "[impose] a temporal deadline on the *resolution* of all transfer claims"; (emphasis added); not on the notice to the fund of transfer claims. This supports the fund's interpretation. The language in *Hall*, however, was dictum and is not binding in this case.

met and those where the requirements had not been met, on July 1, 1999, it easily could have so provided.

Furthermore, as the board suggested in *Kuban,* under the fund's interpretation, any claim for a transfer assigned by the commissioner to a panel of physicians on June 30, 1999, would have been terminated the next day. In addition, the fund would have had the ability to bar claims seeking a transfer simply by engaging in delaying tactics in such cases until the statutory deadline had passed. "We doubt that the legislature intended to create such a difficult situation in the interest of expediting the final resolution of Second Injury Fund transfer cases." Id.

Finally, we note that the fund's interpretation of the statute would raise due process concerns, in that it would seriously infringe upon an employer's statutory right to an adjudication of a claim seeking a transfer to the fund and to administrative and judicial review of decisions on such claims. We recognize that the contours and, indeed, the very existence of those rights are at issue in this appeal. It would be absurd, however, to say that this court does not have jurisdiction to determine whether a statute unconstitutionally deprived persons of certain rights because the statute deprived them of those rights. We conclude that an unduly restrictive time constraint on the litigation of claims for a transfer, including litigation of the questions of whether an employer is constitutionally entitled to an adjudication and, if so, in what form, would be of questionable constitutionality.

"[I]f literal construction of a statute raises serious constitutional questions, we are obligated to search for a construction that will accomplish the legislature's purpose without risking the statute's invalidity." *Worsham* v. *Greifenberger,* 242 Conn. 432, 443, 698 A.2d 867 (1997). Moreover, we must presume that "the legislature

. . . intended a reasonable, just and constitutional result." (Internal quotation marks omitted.) *Kulig* v. *Crown Supermarket*, supra, 250 Conn. 608. We conclude that the city's interpretation of § 31-349h is the more reasonable and fair of the two interpretations, and that it avoids the constitutional questions raised by the fund's interpretation. Accordingly, we interpret § 31-349h to mean that claims not eligible to be transferred to the second injury fund, on or before July 1, 1999, because 104 weeks of payments had not been made by the employer or by its insurer or because the statutory notice requirements had not been met, shall remain the responsibility of the employer or its insurer. If those requirements have been met, however, but the eligibility of a claim was in dispute on July 1, 1999, transfer of the claim is not barred if the claim is ultimately found to have been eligible for transfer before that date. Accordingly, if it is ultimately determined in this case that the claim should have been transferred to the fund before July 1, 1999, practical relief may be granted. Therefore, the city's claim is not moot.

## II

We now address the city's claim that § 31-349c (a) deprives it of a protected property interest without due process of law in violation of the fourteenth amendment to the United States constitution and article first, §§ 8 and 10, of the Connecticut constitution. The city argues that it has a protected property interest in the benefit created by the statutes governing the fund, namely, the right to transfer liability for a workers' compensation claim involving a "second injury" to the fund after payment of 104 weeks of benefits, and that the procedure provided by § 31-349c (a) is constitutionally inadequate to protect that interest. The fund argues that the city has no such property interest, and that, even if we assume that it does, the statutory procedures are constitutionally adequate. We agree with the city.

## A

"Our due process inquiry takes the form of a two part analysis. '[W]e must determine whether [the city] was deprived of a protected interest, and, if so, what process was [its] due.' *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982); see also *Board of Regents* v. *Roth*, 408 U.S. 564, 576, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 322, 627 A.2d 909 (1993); *State* v. *Campbell*, 224 Conn. 168, 181, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993) ('[d]ue process analysis begins with the identification of the life, liberty or property interest at stake')." *Worsham* v. *Greifenberger*, supra, 242 Conn. 438. Accordingly, we first address the question of whether the city has a protected property interest in the statutory right to transfer a claim to the fund.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents* v. *Roth*, supra, 408 U.S. 577.

"This rule [that a person must have a legitimate claim of entitlement to possess a protectible interest in a benefit] applies even where the loss suffered is great. [T]o determine whether due process requirements apply in the first place, we must look not to the weight but to the *nature* of the interest at stake." (Emphasis in original; internal quotation marks omitted.) *D'Amico* v. *Johnson*, 53 Conn. App. 855, 862, 733 A.2d 869 (1999), quoting *Karan* v. *Adams*, 807 F. Sup. 900, 908 (D. Conn. 1992).

" '[P]roperty' denotes a broad range of interests that are secured by 'existing rules or understandings.' [*Board of Regents* v. *Roth*, supra, 408 U.S.] 577. A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry* v. *Sindermann*, 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).

"A statute or ordinance providing procedural guarantees does not create a constitutionally protected property interest unless it sets forth substantive criteria that limit the discretion of the decisionmaking body. *Cain* v. *Larson*, [879 F.2d 1424, 1426 (7th Cir.), cert. denied, 493 U.S. 992, 110 S. Ct. 540, 107 L. Ed. 2d 537 (1989)]; *Fleury* v. *Clayton*, 847 F.2d 1229, 1231 (7th Cir. 1988); see *Olim* v. *Wakinekona*, 461 U.S. 238, 248–51, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983); *Hewitt* v. *Helms*, 459 U.S. 460, 471, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983). . . . Even if the statute includes substantive criteria, a party whose asserted property interest is not related to the substantive criteria but rather is grounded solely in the procedures set forth in the statute does not have a constitutionally cognizable property interest." (Citation omitted.) *Double I Ltd. Partnership* v. *Plan & Zoning Commission*, 218 Conn. 65, 78, 588 A.2d 624 (1991).

The fund first argues that this court's holding in *Cece* v. *Felix Industries, Inc.*, 248 Conn. 457, 728 A.2d 505 (1999), that an employer has no protected property interest arising out of a contract with the fund, is dispositive of this case. In *Cece,* this court considered the constitutionality of certain provisions of P.A. 95-277. Before the enactment of P.A. 95-277, a person seeking to transfer a claim to the fund was required by the terms of § 31-349 then in effect to give notice to the fund of the claim to transfer. Id., 460. The portion of P.A. 95-277 ultimately codified at General Statutes (Rev. to 1997) § 31-349 (e) required that, for injuries previously noticed pursuant to § 31-349, the party seeking a transfer must send a new notice to the fund prior to October 1, 1995, or the claim "shall be deemed withdrawn with prejudice . . . ." The respondent employer and the respondent insurer in *Cece* failed to comply with the renotification requirement. Id., 460-61. The commissioner held, however, that the statute had no retroactive effect and the fund was liable for the claim for a transfer. Id., 461. The board reversed that decision, holding that the statute was retroactive. The respondents appealed from the board's ruling, claiming that the renotification provision violated the contract clause and the due process clause of the United States constitution. Id., 462.

The respondents argued on appeal that they had a preexisting contract with the fund that entitled them to an opportunity to transfer legitimate claims to the fund, and that the renotification provision of General Statutes (Rev. to 1997) § 31-349 (e) impaired that contractual interest, in violation of both the contract clause and the due process clause of the United States constitution. Id. Thus, the claim did not involve a challenge to the constitutional adequacy of the procedures provided by § 31-349c. Nor did the respondents argue that the new renotification procedure ultimately codified at

General Statutes (Rev. to 1997) § 31-349 (e) inadequately protected their right to the substantive benefit provided by § 31-349. Rather, they claimed, in essence, that the *unilateral substitution* of one procedural scheme for another procedural scheme, itself, constituted an impairment of their preexisting contractual rights and, therefore, a deprivation of due process. Cf. *Pineman* v. *Oechslin*, 195 Conn. 405, 414, 488 A.2d 803 (1985) ("[t]o find that a statutory [scheme] gives rise to contractual rights . . . while permitting unilateral modification of the . . . 'contract' by the state under certain circumstances, defies the basic contract law tenet that modification requires mutual assent"). Presumably, this would be so even if the second procedural scheme otherwise met the requirements of due process. Because the claim in *Cece* was grounded in the preexisting procedures of the statute, and not in its substance, if no contractual right to those procedures could be found, no protected property right could be found. See *Double I Ltd. Partnership* v. *Plan & Zoning Commission*, supra, 218 Conn. 78 ("a party whose asserted property interest is not related to the substantive criteria but rather is grounded solely in the procedures set forth in the statute does not have a constitutionally cognizable property interest"). This court concluded that the respondents in *Cece* had no contractual relationship with the fund and, thus, no protected property interest. Therefore, there could be no due process violation. *Cece* v. *Felix Industries, Inc.*, supra, 248 Conn. 465.

The fund misapprehends the nature of the city's claim by arguing that *Cece* v. *Felix Industries, Inc.*, supra, 248 Conn. 457, applies to this case. The city is not claiming that it has a *contractual* right to transfer the claim to the fund or that such a right was abrogated by the change in statutory procedures, per se. Rather, it is claiming that its statutory right to transfer the claim is a protected property interest, the substance of which

was not affected by the 1995 statutory revisions, and that the revised procedures do not adequately protect that interest. Although we held in *Cece*, and, indeed, the respondents conceded, that, because there was no claim that the revised notice procedures were constitutionally inadequate, the only potential source of a protected property interest *in that case* was the contractual interest claimed by the respondents, we have never held that, *as a general rule*, the only source of a protected property interest in a statutory benefit is a vested contractual right in that benefit.[11] Accordingly, we conclude that *Cece* does not govern this case.

The fund next argues that, even if *Cece* does not apply, an applicant for a statutory benefit, as opposed to a person already receiving the benefit, has no protected property interest in the benefit. We disagree.

The fund relies primarily on *American Manufacturers Mutual Ins. Co.* v. *Sullivan*, 526 U.S. 40, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999), in support of its argument. In that case, which also involved a workers' compensation statute, the United States Supreme Court consid-

---

[11] We recognize that "protectible property interest" jurisprudence has "vested contractual interest" overtones, inasmuch as both doctrines deal with legally protectible expectations. Nevertheless, the two legal doctrines are clearly distinguishable. This court has held that "[w]hen the legislature intend[ed] to surrender its power of amendment and revision by creating a *contract* and thereby binding future legislatures, it must declare that intention in clear and unambiguous terms." (Emphasis added.) *Pineman* v. *Oechslin*, supra, 195 Conn. 415. When the legislature has created such a contract, it may not unilaterally modify any of its terms. Id., 414.

As discussed more fully later in this opinion, however, no such "clear and unambiguous" statement is required for the creation of a legitimate entitlement to—i.e., a protected property interest in—a statutory benefit. All that is required is that the statute place substantive restrictions on the discretion of the government body responsible for administering the benefit. When such an entitlement has been created, the legislature may unilaterally modify the criteria for eligibility, or even terminate the benefit program. As long as a statutory entitlement exists, however, any procedures for its administration must meet the constitutional requirements of due process.

ered the constitutionality of a statutory provision that created a utilization review procedure under which the reasonableness and necessity of an employee's medical treatment could be reviewed before a medical bill must be paid. Id., 45. Under the statute, an insurer, upon requesting such a review, was permitted to withhold payment to health care providers for the services being challenged. Id., 45–46. If the services were ultimately found to be reasonable and necessary, the insurer was required to pay the bill immediately, with interest, plus the cost of the utilization review. Id., 47. A number of employees whose benefits had been withheld pending review claimed that the state and the private insurers, acting under color of state law, had deprived them of property in violation of their due process rights. Id., 47–48.

The Supreme Court held that the employees "do not have a property interest . . . in having their providers paid for treatment that has yet to be found reasonable and necessary. To state the argument is to refute it, for what respondents ask in this case is that insurers be required to pay for patently unreasonable, unnecessary, and even fraudulent medical care without any right, under state law, to seek reimbursement from providers." Id., 61.

We conclude that *American Manufacturers Mutual Ins. Co.* v. *Sullivan,* supra, 526 U.S. 40, is distinguishable from this case on a number of grounds. First, in that case, the due process claim involved merely the timing of the payment of benefits, and the Supreme Court concluded only that the employees had no property interest in *prehearing* benefits. There was no claim, as there is in this case, that the statutory procedure itself, namely, the utilization review, was inadequate to protect the employees' entitlement to workers' compensation benefits, and that the employees could, therefore, be deprived, erroneously and forever, of those benefits.

The court in *American Manufacturers Mutual Ins. Co.* recognized that, once an employee had established that the medical treatment at issue was reasonable and necessary, he had established a protected property right in the benefit. Id., 61. If the employees had claimed that the statute provided inadequate procedures for establishing such a right, the court's analysis might have been very different.

Second, in *American Manufacturers Mutual Ins. Co.*, the court suggested that the procedure sought by the employees, namely, the payment of benefits before the utilization review, would have deprived the employers and insurers of property without due process. There is no such concern in this case.

The fund also relies on *Lyng* v. *Payne*, 476 U.S. 926, 106 S. Ct. 2333, 90 L. Ed. 2d 921 (1986), and *Walters* v. *National Assn. of Radiation Survivors*, 473 U.S. 305, 105 S. Ct. 3180, 87 L. Ed. 2d 220 (1985). In those cases, the United States Supreme Court noted that "[w]e have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment. *Walters* v. *National Association of Radiation Survivors*, [supra, 320 n.8]." *Lyng* v. *Payne*, supra, 942.[12] The Supreme Court, however, never has held that applicants for statu-

---

[12] *Lyng* involved a claim by a number of farmers that the failure of the Farmers Home Administration to publicize the existence of a loan program for which the farmers had been eligible was a violation of due process. *Lyng* v. *Payne*, supra, 476 U.S. 932. After noting that it never had held that applicants for benefits had a protected property interest, the Supreme Court stated that, under the circumstances of that case, even if the farmers had such a property interest, the requirements of due process had been met. Id., 942. *Walters* involved a claim that a statutory limitation on the fee that may be paid to an attorney representing a veteran seeking benefits from the Veteran's Administration violated due process because it denied the veterans the opportunity to retain counsel of their choice. *Walters* v. *National Assn. of Radiation Survivors*, supra, 473 U.S. 307.

tory benefits have no such claim of entitlement.[13] In *Walters*, the court noted that "[t]he District Court held that applicants for benefits, no less than persons already receiving them, had a 'legitimate claim of entitlement' to benefits if they met the statutory qualifications." *Walters* v. *National Assn. of Radiation Survivors*, supra, 320 n.8. The Supreme Court concluded, however, that, because at least one of the claimants in that case had already received benefits, it was not required to determine whether applicants for statutory benefits have a property interest in those benefits. Id.

Although the United States Supreme Court has not directly confronted the general question of whether applicants for a statutory benefit, as opposed to those already receiving it, have a protected property interest in the benefit, it has addressed a related question, namely, whether an applicant for parole has, under the governing statutes, a protectible interest in release from prison. See, e.g., *Greenholtz* v. *Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979). In *Greenholtz*, the court held that the mandatory language of the Nebraska statute at issue in that case, which provided that the parole board "*shall* order [the prisoner's] release"; (emphasis added) id., 11; unless the board was of the opinion that release should be deferred because of the existence of

---

[13] "[I]t should be noted that the Supreme Court has not yet been confronted with a state which refuses to give any explanation or procedure to a person who is denied an initial allocation of a very important government benefit. For example, if a town refused to accept a particular child into its primary educational system, even though the child appeared to qualify under applicable law, it is difficult to believe that the concept of present enjoyment or entitlement would eliminate the requirement of a fair procedure to determine the basis for this action. It is possible that in such a case the court would find that the definition of eligibility constituted a previous entitlement even though there was no actual receipt of the benefit prior to the request for a hearing. However, the concept of present enjoyment is undefined at this time." 3 R. Rotunda & J. Nowak, Constitutional Law, Substance and Procedure (3d Ed. 1999) § 17.5, pp. 71–72.

one or more of several enumerated conditions, created a protectible entitlement. Id., 12.[14]

A number of Circuit Courts of Appeals also have recognized in a variety of contexts that statutory restrictions on the decision maker's discretion give applicants for statutory benefits a protectible property interest in the benefits. See *Washington Legal Clinic for the Homeless* v. *Barry*, 107 F.3d 32, 35–36 (D.C. Cir. 1997) (recognizing that applicant for benefit has protected property interest when governing statutes places substantive limits on official discretion, and holding that applicants for emergency housing have no such interest because governing law did not tell administrators how to choose between eligible applicants); *Eidson* v. *Pierce*, 745 F.2d 453, 454 (7th Cir. 1984) (recognizing that principal question to be resolved in determining whether applicants for benefit have property interest in benefit is whether applicants would be able to establish at a hearing facts that would entitle them to benefit, and holding that applicants for section 8 housing do not have entitlement interest because governing law does not tell private owner of housing how to choose between eligible applicants); *Griffeth* v. *Detrich*, 603 F.2d 118, 120–21 (9th Cir. 1979), cert. denied, 445 U.S. 970, 100 S. Ct. 1348, 64 L. Ed. 2d 247 (1980) (mandatory language of authorizing statute created property interest in applicants for general assistance); *Like* v. *Carter*, 448 F.2d 798, 805 (8th Cir. 1971), cert. denied, 405 U.S. 1045, 92 S. Ct. 1309, 31 L. Ed. 2d 588 (1972) (state and federal statutes requiring prompt processing of applica-

---

[14] We also note that, in a case involving an application to practice law before the United States Board of Tax Appeals, the United States Supreme Court held that, even if the governing rules provided the decision-making body with wide discretion to deny the application, the discretionary power "must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process." *Goldsmith* v. *Board of Tax Appeals*, 270 U.S. 117, 123, 46 S. Ct. 215, 70 L. Ed. 494 (1926).

tions for public assistance created entitlement to retroactive payments); see also *Kelly* v. *Railroad Retirement Board*, 625 F.2d 486, 490 (3d Cir. 1980) (considering whether applicant for disabled child annuity has protected property interest and holding that "due process must attach to the process of determining eligibility, whether at the outset or after receipt of benefits"); *Wright* v. *Califano*, 587 F.2d 345, 354 (7th Cir. 1978) (holding that denial of social security benefits does not "deserve less due process than terminations [of benefits]"); *Holmes* v. *New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968) (holding that applicants for public housing entitled to decision-making procedures with ascertainable standards).

This court previously has not addressed the general question of whether an *applicant* for a government benefit, as opposed to an actual *recipient*, has a protected property interest in the benefit. We have addressed that question, however, in the specific context of cases involving land use regulation and have adopted the "clear entitlement" test in such cases. See, e.g., *Kelley Property Development, Inc.* v. *Lebanon*, supra, 226 Conn. 321. In *Kelley Property Development, Inc.*, the plaintiff claimed that he had a protected property interest in the approval of his subdivision application. Id. Applying the "clear entitlement" test, we held that, because the local zoning officials had wide discretion under the governing regulation, there was no such interest. Id., 325–30. "The 'clear entitlement' test asks whether there is a certainty or a very strong likelihood that the application in question would have been granted, but for the wrongful conduct of the local officials. . . . A very strong likelihood means not simply a high probability of approval, but rather a virtual assurance of approval because any discretion is narrowly circumscribed. . . . 'Application of the ["clear entitlement"] test must focus primarily on the degree of discre-

tion enjoyed by the issuing authority, not on the estimated probability that the authority will act favorably in a particular case.'" (Citations omitted.) Id., 322–23; see also *Double I Ltd. Partnership* v. *Plan & Zoning Commission*, supra, 218 Conn. 78 ("[a] statute or ordinance providing procedural guarantees does not create a constitutionally protected property interest unless it sets forth substantive criteria that limit the discretion of the decisionmaking body"). We also note that, in a case involving the plaintiff's claim that the denial of an application for a clinical social worker's license violated due process, the Appellate Court held that " '[t]he fact that the permit could have been denied on nonarbitrary grounds defeats the due process claim.' " *D'Amico* v. *Johnson*, supra, 53 Conn. App. 863.

With these principles in mind, we conclude that, when a due process claim has been raised by an applicant for a statutory benefit, the applicant has a protected property interest in the benefit when, under the governing statute, the decision-making body would have no discretion to deny the application if the applicant could establish at a hearing that it met the statutory criteria. Accordingly, we turn to the language of § 31-349.

Section 31-349 (a) provides that, "[i]f an employee having a previous disability incurs a second disability from a second injury resulting in a permanent disability caused by both the previous disability and the second injury which is materially and substantially greater than the disability that would have resulted from the second injury alone," then, as provided by subsection (b), "[t]he employer by whom the employee is employed at the time of the second injury, or its insurer, shall in the first instance pay all awards of compensation and all medical expenses provided by this chapter for the first

one hundred four weeks of disability. . . ."[15] "Thereafter, if proper notice is filed with the fund ninety days before the expiration of the 104 week period, liability for compensation may be transferred to the custodian of the fund." *Davis* v. *Norwich*, 232 Conn. 311, 318, 654 A.2d 1221 (1995).

Thus, the statute sets forth substantive criteria that limit the commissioner's discretion in considering claims for a transfer of liability to the fund. Although there is no explicit mandatory language in the statute providing that the commissioner "shall" grant a transfer of liability when the substantive criteria are established, we cannot conclude, nor does the fund claim, that it would be within the commissioner's discretion to deny a claim for a transfer if the commissioner determined that the substantive criteria of the statute had been met, i.e., that the employee had a previous disability and has incurred a second injury resulting in a permanent disability that is materially and substantially greater than the disability that would have resulted from the second injury alone, that the employer has paid 104 weeks of disability to the employee, and that the employer has given proper notice to the fund, all before the statutory deadline for closing of the fund.

Thus, we cannot conclude that the statute gives rise to a mere "abstract need or desire," or a "unilateral expectation"; cf. *Board of Regents* v. *Roth*, supra, 408 U.S. 577; that, if the requirements of the statute are met, liability for a claim will be transferred to the fund.[16]

---

[15] That language, taken from the current revision of § 31-349, although not identical to the language in General Statutes (Rev. to 1987) § 31-349, as amended by Public Acts 1988, No. 88-40, the version in effect at the time the city filed its notice of intent to transfer the claim; see footnote 1 of this opinion; has the same practical effect.

[16] This is particularly so when the fund is funded not by general state revenues, but by assessments against employers. See General Statutes § 31-354. We are not persuaded by the fund's argument at oral argument that an employer's payment into the fund should not give rise to an entitlement to the benefit, because the fund is funded annually on the basis of its liabilities for the year. Therefore, the fund argued, the *closing* of the second injury

Rather, we conclude that, when, at a hearing, an employer could establish facts that would meet the substantive criteria of § 31-349, the employer has a legitimate claim of entitlement to a transfer of liability to the fund. Accordingly, we conclude that the city has a protected property interest in its claim for a transfer.

B

Having concluded that the city has a protected property interest in a transfer of liability to the fund, we now consider whether the statutory procedures are constitutionally adequate to protect that interest. "It is axiomatic that due process is flexible and calls for such procedural protections as the particular situation demands." (Internal quotation marks omitted.) *Connecticut Natural Gas Corp.* v. *Miller*, 239 Conn. 313, 319–20, 684 A.2d 1173 (1996). "The United States Supreme Court [has] set forth three factors to consider when analyzing whether an individual is constitutionally entitled to a particular judicial or administrative procedure: First, the private interest that will be affected by the official action; second, the risk of an

---

fund does not deprive the city of due process, because the city's payments into the fund were not intended to fund future, inchoate liabilities, such as the claim in this case. That argument, however, misapprehends the city's claim. The city is not claiming that it has a due process right to the benefit created by the statute in perpetuity, and, therefore, that the legislature cannot close the fund. Rather, it is claiming that it met the substantive statutory criteria for transfer of liability to the fund before the date that the fund was closed, but that it was unconstitutionally denied an adequate opportunity to establish that fact.

It may be true that, if the legislature eliminates a statutory benefit, the requirements of due process are met by the legislative process. "However, the state cannot grant a person a right to a benefit that would be an 'entitlement' for due process purposes and then, by statutory action or administrative ruling, give recipients fewer procedural safeguards for the termination [or, as we have concluded, the initial denial] of that benefit than would be required by a judicial analysis of due process principles." 3 R. Rotunda & J. Nowak, Constitutional Law, Substance and Procedure (3d Ed. 1999) § 17.5, p. 72.

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)." (Internal quotation marks omitted.) *Hunt* v. *Prior*, 236 Conn. 421, 439–40, 673 A.2d 514 (1996). "[T]he degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process." *Mathews* v. *Eldridge*, supra, 341. "Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures." *State* v. *Patterson*, 236 Conn. 561, 571, 674 A.2d 416 (1996).

"The fundamental requisite of due process of law is the opportunity to be heard. . . . The hearing must be at a meaningful time and in a meaningful manner. . . . [T]hese principles require that a [party] have . . . an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally. These rights are important in cases . . . where [a party has] challenged [the administrative determination] as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." (Citations omitted; internal quotation marks omitted.) *Goldberg* v. *Kelly*, 397 U.S. 254, 267–68, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970).

"Hearings before administrative agencies . . . although informal and conducted without regard to the strict rules of evidence, must be conducted so as not to violate the fundamental rules of natural justice. . . . Due process of law requires not only that there be due

notice of the hearing but that at the hearing the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence." (Citations omitted; internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 536, 525 A.2d 940 (1987).

Applying the first prong of the test of *Mathews* v. *Eldridge*, supra, 424 U.S. 335, we conclude that the city's interest is substantial. If the claim were to be transferred to the fund, the city's liability would be limited to 104 weeks of compensation and medical expenses. Thus, the interest at stake is the city's liability for all past and future lost wages, medical expenses and potential death claims, beyond the 104 weeks of liability. The city claims that it will be entitled to over $100,000 in reimbursement for past payments alone if the claim is transferred. Clearly, therefore, the city's interest is substantial.

We now consider "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards . . . ." *Mathews* v. *Eldridge*, supra, 424 U.S. 335. Section 31-349c (a) provides that disputes concerning a claim for transfer to the fund shall be submitted to a panel of three physicians appointed by the chairman of the commission, along with whatever evidence the chairman deems necessary for consideration. The panel is also authorized to examine the claimant. The panel's opinion is determined by a majority vote of the three members and is binding on all parties, with no appeal to the board permitted.

We conclude for the following reasons that the risk of an erroneous determination of a claim for a transfer under these procedures is significant. The statute provides that the physician panel is chosen by the chair-

man, with no opportunity for the parties to ascertain whether a panel member has a connection to one of the parties that could bias his decision, or to object to an appointment. There is no statutory requirement that the panel include an expert in the medical field pertaining to the claimant's injuries. The evidence submitted to the panel is chosen by the chairman, with no opportunity for the parties to review the evidence before the decision, to object to it, to offer rebuttal evidence, or to cross-examine. Furthermore, the panel is not required to disclose to the parties the evidence that it relied on or the basis for its decision. See *Gennarini* v. *Gennarini*, 2 Conn. App. 132, 135, 477 A.2d 674 (1984) (recognizing that "secret evidence" has long been considered constitutionally invalid). The claimant is examined by the panel with no opportunity for the parties to review the panel's medical findings prior to the decision. There is no procedure to ensure that the panel applies appropriate legal standards governing burden of proof and the legal definitions of applicable statutory terms and phrases, such as "materially and substantially greater." See General Statutes § 31-349. The parties have no opportunity to present arguments to the panel based on all of the evidence before the panel. Finally, the statute provides that the panel's decision is binding and provides no opportunity for the parties to seek correction of clearly erroneous factual findings or to challenge the application of improper legal standards.

We note that the panel's decision in this case did contain at least one clearly erroneous finding, namely, that Drakonakis had concluded that "there was a 'remote' relationship between the pre-existing coronary artery disease and the work activities which precipitated the heart attack," when, in fact, Drakonakis had concluded precisely the opposite. The city had no opportunity to challenge that finding. We also note that

there is no indication that the panel members were instructed in or employed the proper legal meanings for such statutory terms as "materially and substantially greater" and "previous disability." Furthermore, although the panel did contain a cardiovascular specialist, Kemler, he did not attend the physical examination of the plaintiff. In addition, the city had no opportunity to review the evidence submitted to the panel by the chairman prior to its submittal, to object to it, to cross-examine on it, and had no opportunity to review or challenge the panel's medical findings before the decision. We conclude that these procedures did not adequately protect the city from an erroneous determination of its claim for a transfer to the fund.

Finally, the third prong of *Mathews* requires us to consider "the Government's interest, including the function involved and the fiscal and administrative burdens that . . . additional or substitute procedural requirements would entail." *Mathews* v. *Eldridge*, supra, 424 U.S. 335. We recognize that "[t]he intention of the framers of the [workers' compensation] act was to establish a speedy, effective and inexpensive method for determining claims for compensation." *Doe* v. *Yale University School of Medicine*, 252 Conn. 641, 672, 748 A.2d 834 (2000). Speed and efficiency, however, may not be obtained at the cost of constitutional rights to due process. We cannot conclude that the burden imposed on the state by the additional procedures requested by the city would outweigh the city's interest in obtaining an accurate determination of its claim for a transfer to the fund. We note that the administrative framework for making such determinations is already in place within the workers' compensation system. Furthermore, because the fund was closed to new claims as of July 1, 1999, the only claims to which any additional procedures will apply are those that were pending on that date and that are still not resolved.

Accordingly, applying the *Mathews* balancing test, we conclude that the procedures provided by § 31-349c (a), as applied to the present case, did not comply with the minimal requirements of due process under the fourteenth amendment to the federal constitution and article first, §§ 8 and 10, of the Connecticut constitution.[17] We conclude that, at a minimum, the parties to a claim seeking transfer to the fund must have an opportunity to review the evidence presented by the chairman to the panel, and the panel's medical findings based on its examination of the claimant, before the panel makes its decision. In addition, the identity of the panel members must be disclosed to the parties, and the parties should have an opportunity to object to panel members on the grounds of potential bias. The parties also must have the opportunity to present their own evidence and arguments to the panel. We further conclude that the panel must contain at least one member who is an expert in the field of medicine that applies to the claimant's injuries. Finally, there must be some level of review by the commissioner to ensure that the panel applies appropriate legal standards and to ensure that there is an opportunity to correct clearly erroneous factual findings.

The decision of the board is reversed and the case is remanded to the board with direction to remand the case to the commissioner for further proceedings according to law.

In this opinion NORCOTT, KATZ and VERTEFEUILLE, Js., concurred.

BORDEN, J., concurring. I agree with, and join, the majority opinion, with one exception. I disagree with

---

[17] Because we conclude that § 31-349c (a) violates the fourteenth amendment to the federal constitution and article first, §§ 8 and 10, of the Connecticut constitution, we need not address the city's claim that the statute is unconstitutionally vague and overbroad.

footnote 8 of the majority opinion to the extent that it suggests that this court may not have subject matter jurisdiction over this appeal. I conclude that we do have jurisdiction, and that any suggestion to the contrary is unwarranted.

First, I note that, despite the suggestion made in the footnote, as a matter of law, the majority has concluded that this court has jurisdiction. That is because the court, after noting what it perceives to be a possible jurisdictional flaw, goes on to decide the case.

It is by now black letter law in this state that the question of subject matter jurisdiction is a question of law; *Simms* v. *Warden*, 229 Conn. 178, 180, 640 A.2d 601 (1994); and, once raised, either by a party or by the court itself, the question must be answered before the court may decide the case. *Dowling* v. *Slotnik*, 244 Conn. 781, 787, 712 A.2d 396, cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998); *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 442, 705 A.2d 1012 (1997). Thus, either we have jurisdiction or we do not. It is not a matter of appellate discretion. Furthermore, the court cannot assume that it has jurisdiction and then go on to decide the case *as if* it did. See *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, 239 Conn. 93, 99, 680 A.2d 1321 (1996) ("[w]henever the absence of jurisdiction is brought to the notice of the court or tribunal, cognizance of it must be taken and the matter passed upon before it can move one further step in the cause; *as any movement is necessarily the exercise of jurisdiction*" [emphasis added; internal quotation marks omitted]). If we do have jurisdiction, we may decide the case; if we do not, we may not decide the case and the appeal must be dismissed. *Ramos* v. *Vernon*, 254 Conn. 799, 808, 761 A.2d 705 (2000) ("the court has a duty to dismiss, even on its own initiative, any [portion of the] appeal that it lacks jurisdiction to hear" [internal quota-

tion marks omitted]). Thus, the factors cited by the majority as justification for deciding the case—despite what it considers to be a "strong argument . . . that . . . this court does not have jurisdiction to entertain the city's appeal" (citations omitted)—namely, that the case is ripe, that the claim involved is purely legal, that the record is adequate for appellate review, and that nothing but delay would be served by dismissing the appeal, are simply irrelevant to the legal question of subject matter jurisdiction. Indeed, in many cases in which we are constrained to dismiss appeals on the basis of a subject matter jurisdictional flaw, those same factors are present. See, e.g., *Daginella* v. *Foremost Ins. Co.*, 197 Conn. 26, 495 A.2d 709 (1985).

Second, the majority's suggestion that this court may not have jurisdiction to decide the constitutional issue because the workers' compensation review board (board) did not have such jurisdiction, is contrary to our case law, both in this court and in the Appellate Court. In *Cleveland* v. *U.S. Printing Ink, Inc.*, 218 Conn. 181, 187–88 n.4, 588 A.2d 194 (1991), an appeal from a decision of the board, this court declined to reach constitutional issues precisely because the defendants had not raised them before the board and, therefore, had not properly preserved the issues for appellate review. In *Caldor, Inc.* v. *Thornton*, 191 Conn. 336, 339, 349, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985), an appeal from a decision of the state board of mediation and arbitration, this court squarely decided a constitutional issue that the board of mediation and arbitration had declined to decide precisely because it had no jurisdiction to do so. In *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 306–309, 695 A.2d 1051 (1997), an appeal from a decision of the board, we declined to decide the facial constitutionality of the same statute that is involved in the present case because of the lack of an adequate

factual record. We did not in any way suggest, more-over, that an adequate factual record—which is present in this case—could be created only by way of a separate declaratory judgment proceeding, as the majority suggests here. The Appellate Court, in appeals from decisions of the board, has considered a constitutional question that had first been presented to the board; *Tufaro* v. *Pepperidge Farm, Inc.*, 24 Conn. App. 234, 236–37, 587 A.2d 1044 (1991); and has decided such a question that was not presented to the board and that the board had no jurisdiction to decide. *Keegan* v. *Aetna Life & Casualty Ins. Co.*, 42 Conn. App. 803, 807–10, 682 A.2d 132, cert. denied, 239 Conn. 942, 686 A.2d 120 (1996).

Third, despite the majority's suggestion that recognizing our jurisdiction in the present case could raise "practical" problems, it is the majority's suggestion itself that would do so. I recognize that administrative agencies, such as the board in the present case, have no jurisdiction to consider or decide constitutional questions. That does not mean, however, that, when a litigant appeals to the courts from a case that was properly before such an agency, the *court* does not have jurisdiction to decide the issue. I know of no case or principle of law that suggests such a limitation on judicial subject matter jurisdiction and, as I have indicated previously, our cases are all to the contrary.

Moreover, the lack of administrative jurisdiction to decide a constitutional issue does not mean, as the majority suggests in footnote 8 of its opinion, that the party seeking to have the court decide the question is required to do so only by way of a separate action for a declaratory judgment, rather than in the course of a duly taken appeal from the administrative agency's decision. Such a procedural rule would raise significant practical concerns. It is not unusual for a party, in an administrative appeal to the court, whether from the

board as in the present case, or from any administrative agency that is, unlike the board, governed by the Uniform Administrative Procedure Act; General Statutes §§ 4-166 through 4-189; to raise a number of claims, some of which are statutory, and one of which may involve the constitutionality of the statute involved or, indeed, of the procedures employed by the agency itself. The majority would suggest that in such a case, the party could raise the statutory claims in the judicial appeal, but would have to sever the constitutional claim or claims and present them by way of a separate action for a declaratory judgment. This hardly commends itself as wise judicial policy, especially when one considers that ordinarily the court, if presented at the same time with all of the claims, would reach the constitutional claim only if necessary. Thus, the majority's suggestion encourages multiplicity of actions, thus adding an unnecessary burden to our already overburdened trial courts. I would eschew such a policy.